### CITY OF CLEVELAND v. McIVER et al.
### No. 8035.

Circuit Court of Appeals, Sixth Circuit.
Jan. 16, 1940.

Neil P. Beall, of Cleveland, Ohio (Alfred Clum, Arthur E. Griffith, McKeehan, Merrick, Arter & Stewart, and George William Cottrell, all of Cleveland, Ohio, on the brief), for appellant city of Cleveland.

L. C. Hinslea and Meyer A. Cook, both of Cleveland, Ohio (Hill, Hamblen, Essery & Lewis, of Detroit, Mich., and Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, on the brief), for appellee Nicholson Transit Co.

Meyer A. Cook and Howell Leuck, both of Cleveland, Ohio, for appellee Bridget McIver.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The steamer Fleetwood, attempting to avoid collision with the Center Street Bridge over the Cuyahoga River at Cleveland, Ohio, when aware that its signal for the opening of the draw was being ignored, reversed its engines. The result was that her stern swung to port, collided with and damaged the fish tug Babe moored at a city dock. The owner of the tug filed a libel

against the steamer and its owners impleaded the City of Cleveland. The latter requested a jury which found the City to have been at fault, the steamer without fault, and assessed damages. The court accepted the verdict, entered judgment in favor of the libelant against the impleaded respondent, and overruled a motion for new trial and to set aside the judgment. The City appeals, and its main contention is that the Fleetwood was likewise at fault so that the damages should have been divided.

The collision occurred at 6:50 p.m. on May 13, 1936, while the Fleetwood, a bulk freight steamer 247 feet long, was down-bound in the Cuyahoga River, loaded with 1900 gross tons of steel. When she was about two-thirds of a mile above the bridge the steamer blew one blast of her whistle, and when a thousand feet from the bridge, the bridge signal of a long blast, two short, and another long, as required by Bulletin 45 of the War Department, issued April 19, 1936, for the opening of drawbridges on the Cuyahoga River. The steamer was then proceeding at about 2 miles an hour with engines at slow speed. When about 800 feet from the bridge the engines were stopped and another bridge signal given, but the draw failed to open. When the steamer had drifted to within 300 feet of the bridge, the bridge captain signalled by waving his hands and calling out that the draw would not open. The steamer's engines were then reversed, but too late to avoid slight contact with the bridge and collision with the tug.

The Center Street Bridge is located under the Superior Street High Level Bridge, and is a highway for both pedestrians and automobiles. It is of the horizontal swing type. The center of the swing span, being mounted on an abutment, divides the river into two draws. Of these, only the east draw is navigable with a clear width for the passage of vessels of about 110 feet. In the middle of the swing span, above its traffic lanes, is a bridge cabin in which is located the machinery for controlling the draw, and at each end of the span are traffic gates capable of being swung across the roadway on the land approach to the bridge. The east traffic gates are operated by the bridge captain and the west gates by the bridge operator through control from the bridge cabin. The two employees constitute the bridge crew. The bridge is equipped with a red ball, 18 inches in diameter, which may be run up and lowered from the bridge operator's cabin, and a city ordinance requires that vessels may not attempt to pass a drawbridge unless the red ball is up.

The bridge was also equipped with an air whistle to warn approaching vessels if, for any reason, the bridge would not be opened in time for safe passage. This whistle was not blown. It is conceded that the bridge operator, though hearing the preliminary whistle, had left his station in the bridge cabin, from which the mechanism for opening and closing the draw is operated, and did not return to his post until after the accident. The bridge captain knew that the operator was not at his post, but there was no arrangement for him to give the warning signal. He testified: "I did not know how to blow the whistle and no one ever showed me." When the steamer was about 800 feet above the bridge, its captain heard the traffic bell which signaled the stoppage of pedestrian and automobile traffic on the bridge, and the traffic gates were thereafter closed.

It has been held so often in this circuit, that though an appeal in admiralty is a trial de novo, the findings of the District Court will be accepted unless clearly against the preponderance of the evidence, that there is no occasion to again consider the scope of the review. Johnson v. Kosmos Portland Cement Co., 6 Cir., 64 F.2d 193; The Wm. A. Paine, 6 Cir., 39 F.2d 586; The Perseus, 6 Cir., 272 F. 633. While the verdict of the jury is regarded in admiralty as merely advisory, its approval by the court constitutes the finding of the court. When a petition to set aside the verdict and grant a new trial is overruled, the situation is analogous to that wherein there are concurrent findings of the court and a master, referee or commissioner. In such cases it has long been held that findings are not to be disturbed except for clear demonstration of mistake.

The appellant's first contention is that the libelant's tug was at fault in being unlawfully moored to the city dock near the abutment of the bridge, without the consent of the Harbormaster. The evidence shows, however, that the Harbormaster had known the position of the tug, without making objection or ordering its removal. The bridge crew likewise knew the tug's position, and it could be seen from the Fleetwood. In any event, there is no room for inference that the position of the tug, even if unlawful per se, was a contributing

proximate cause of the collision. The Edward E. Loomis, 2 Cir., 86 F.2d 705.

There is no question, upon the present record, of the appellant's negligence,—it appears to be conceded. The sole issue is whether the Fleetwood was at fault in failing to reverse her engines in time to avoid contact with the bridge and collision with the tug. The appellant relies chiefly upon the ordinance, Section 2282 of the Ordinances of the City of Cleveland, which provides that it shall be unlawful for a vessel to attempt to pass any city drawbridge until the red ball or lantern is up, and upon the bulletin of the War Department, issued April 19, 1936, which requires that bridges, including that here involved, have a red ball for day use and a red light for night use to be run up as a signal that the draw is to be opened, and requires that vessels must not attempt passage until the ball or light is up.

■ Admittedly, the ball was not raised. While there is evidence that the ordinance was not uniformly observed, and while there is authority for the view that such ordinances are not within the power of a municipality in a field wherein national authority controls, City of Chicago v. Chicago Transp. Co., 7 Cir., 222 F. 238, L.R.A.1915F, 1062, decision is not required on either ground. A bridge over a navigable stream obstructs navigation, the right to which is paramount. In recognition of this right, Congress has provided (Title 33, § 494, U.S. C.A.) that if a bridge is constructed with a draw, the draw shall be opened promptly upon reasonable signal, and (Title 33, § 499, U.S.C.A.) that the rules and regulations of the Secretary of War requiring the opening of drawbridges shall have the force of law. So it has been held that if, for any reason, a bridge cannot be opened, proper signals to · that effect should be given. Clement v. Metropolitan etc. Ry. Co., 7 Cir., 123 F. 271; Great Lakes Towing Company v. Masaba S. S. Co., 6 Cir., 237 F. 577; Dorrington v. City of Detroit, 6 Cir., 223 F. 232, 243, 245.

■■ Upon the sounding of the bridge signals by the Fleetwood, its master, proceeding at slow speed, had the right to assume that the law would be obeyed and that the draw would open unless the· customary warning signal was given. It is true the red ball was not up, but if it were it would have conveyed no information to the master of the Fleetwood beyond that furnished by the closed draw, Chicago v.

Transportation Co., supra. On the other hand, the sounding of the traffic bells and the closing of the traffic gates upon the bridge, expressed to his mind the intention of the bridge crew to open the draw. They constituted an invitation to proceed. In relying upon them he was guilty of no fault. It is as though a flagman at a railroad crossing should waive the highway traffic through, notwithstanding a warning red light.

■■ Whether, after being made aware, by the signal of the bridge captain, that the draw would not open, the efforts of the Fleetwood to avoid collision rose to skillful navigation, is of little significance, since the maneuver was in the face of an emergency and must be so tested. The Eureka, 9 Cir., 80 F.2d 303. We are not persuaded of error in the verdict below, its acceptance by the court albeit advisory, nor of abuse of discretion in overruling the motion for new trial.

The judgment below is affirmed.