**MICHIGAN BELL TELEPHONE COM-PANY, a Michigan corporation, Libelant-Appellee,**

v.

**COPPER RANGE RAILROAD COMPA-NY, a Michigan corporation, Respondent and Cross-Respondent-Appellee,**

and

**American Steamship Company, a New York corporation, Respondent. and Cross-Libelant-Appellant.**

No. 16121.

United States Court of Appeals
Sixth Circuit.

Jan. 21, 1966.

James P. Heffernan, Buffalo, N. Y., for appellant, Coffey, Heffernan & Harrison, Buffalo, N. Y., Foster, Meadows & Ballard, Detroit, Mich., on the brief.

Lawrence P. Walsh, Ontonagon, Mich., for appellee, Walsh & Munro, Ontonagon, Mich., on the brief.

9. See United States for the Use of Bachman & Keffer Const. Co. v. H. G. Co- zad Constr. Co., Inc., 10 Cir., 324 F.2d 617, 620.

Before PHILLIPS and EDWARDS, Circuit Judges, and CECIL, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This is an appeal in an admiralty case. The Michigan Bell Telephone Company claimed $22,339.62 of damages to two of its underwater cables which were fouled by the anchor of the Steamer J. F. Schoellkopf, Jr.

The Schoellkopf (owned by the American Steamship Company) dropped anchor in the narrow Keweenaw Waterway, when a lift bridge failed to open on signal. The anchor, after fouling the cables, stopped the Schoellkopf short of the bridge, but her propeller (used in reverse) pulled her stern to port, striking some underwater object. The lift bridge was owned by the Michigan State Highway Department, but was leased to and operated by the Copper Range Railroad Company. The steamship company filed a cross-libel against the telephone company and the railroad company claiming $7,531.73 damages.

After trial before the United States District Court for the Western District of Michigan, Northern Division, the District Judge entered a decree in favor of Michigan Bell and against both American Steamship Company and Copper Range Railroad Company, holding them jointly liable and awarding $11,169.81 damages against each. He also awarded damages to American Steamship Company against the Copper Range Railroad Company in the sum of $3,765.87—one-half of the damages done to the Schoellkopf. The railroad did not appeal the award but the steamship company did.

Appellant steamship company claims that the record shows as a matter of law that the railroad company must be held liable for all the damages to both cables and ship.

The events involved occurred between 2 A.M. and 3 A.M. on June 24, 1960. The Schoellkopf, a 7,500 ton, single-screw vessel of 535 feet in overall length was proceeding west in the Keweenaw Waterway bound for a coal dock in Hancock, Michigan, with 8,000 tons of coal. It was approaching the Keweenaw Waterway bridge connecting Houghton and Hancock in Michigan's Upper Peninsula, where the channel in Portage Lake narrows to 300 to 400 feet in width.

On the early morning in question the Schoellkopf's captain, Captain Albert S. Wilhelmy, was in command on her bridge. At a point 6,900 feet from the lift bridge, at the Captain's order, the Schoellkopf blew the signal for raising the bridge. On this clear night the bridge was plainly visible, with its warning light showing red for ship traffic. There was no response from the bridge. The Schoellkopf blew the lift signal again, and receiving no response, then blew the emergency signal of five short blasts and then repeated the signal to lift the bridge.

It is undisputed that the bridge signal and the emergency signal were sounded repeatedly and almost continuously while the Schoellkopf proceeded approximately one mile to the point where she dropped her anchor.

Although her signals did not gain the attention of the bridge, they did arouse residents on both sides of the waterway who came out in nightclothes to see what was happening. And they did alert two police officers who were at the Hancock police station eight blocks on the other side of the bridge. The officers, hearing the unusual signals, drove to the bridge, arriving there just in time to hear the Schoellkopf drop anchor. One of them climbed over a ten foot fence and yelled at the bridge tender, "Didn't you hear that signal?" His partner testified that the bridge tender responded, "No," and that he then heard the chains start to raise the bridge.

Meantime, the Schoellkopf, after reversing her engines and dropping her anchor and dragging it 500 feet, had come to a full stop approximately 1,200 feet from the bridge. But this was not accomplished until after her stern and propeller had struck and been damaged by some underwater object and until after her anchor flukes had hooked two underwater cables owned by Michigan

Bell and fouled them so that they had to be cut.

The cable crossing was marked by signs on both banks (unlighted) and was indicated on navigation charts. These place the cables' location as 1,700 feet from the bridge. Captain Wilhelmy testified that he knew the cables' location, but thought he had cleared it when he dropped anchor.

The regulations under which the Keweenaw Waterway bridge is operated provide in part:

Subsection (b): "Vessels approaching the bridge shall reduce their speed sufficiently to enable them to come to a stop before arrival at the bridge should the draw fail to open."

Subsection (c): "The call signal for opening of the draw shall be one long and two short blasts. If the draw can be opened promptly the bridge tender shall reply by repeating the call signal. If the draw cannot be opened promptly, or if it is open and must be closed immediately, the bridge tender shall reply by sounding five short and rapid blasts, to be repeated at regular intervals until acknowledged by the vessel. The vessel shall acknowledge by sounding five short and rapid blasts. Thereafter, as soon as the draw can be opened, the draw tender shall repeat the call signal."

None of the facts recited above seem to be in any way at issue on this appeal. But the facts and inferences pertaining to the ship's speed and operation from the point where it first signaled until it was at anchor clearly are in dispute.

In this regard the District Judge found:

"He [Captain Wilhelmy] testified that at Buoy 41, 6,900 feet from the bridge, he was traveling at a speed of three to four miles per hour, statute miles. He testified that in the vicinity of Buoy 41 he blew for the bridge with the prescribed bridge signal, which was one long blast and two short blasts.

"He testified that he continued up the waterway at approximately the same speed; that when he did not receive a response from the bridge, as required by Federal regulation, he again blew the bridge signal of one long blast and two short blasts. Not receiving any response, he then gave the danger signal, consisting of five or more short blasts, and followed this with the bridge signal again.

"At that time he had traveled approximately a quarter of a mile, or perhaps somewhat more, from the vicinity of Channel Marker 41, or Buoy 41, as it has been referred to on the trial. In any event, he was still one mile, approximately, perhaps somewhat more, from the bridge when he gave the danger signal. He then almost immediately repeated the danger signal and the bridge signal, and he continued to give the danger signal in approaching the bridge.

"He says he reduced his speed somewhat, but did not make any effort to stop until he was within one-half mile of the bridge, at which time he began to back and fill, as it was described, a process of reversing the engines full speed astern, which caused the stern of the vessel to swing to port, and then filling by proceeding forward either under way or with the engines moving in order to restore the vessel's path of travel.

"Having proceeded to a point somewhat more than 1,700 feet from the bridge, where the cables of the libelant were laid, he then concluded that the bridge was not going to open. He apparently concluded that he could not stop his vessel safely within the waterway without dropping the anchor. He dropped his anchor, stopped his vessel with some damage to the screw, either before or after dropping the anchor; and thereafter, some time thereafter, the bridge opened."

On these findings he concluded:

"Under the circumstances, the court can only conclude, with all due respect to the master of the vessel, that he proceeded into a position of danger when he knew or should have known that he was proceeding into a position of danger, and was negligent within the meaning of the maritime law in proceeding in such manner. There was fault on the part of the vessel which was a proximate cause of the damage sustained by the vessel and by the Michigan Bell Telephone Company."

Previously the trial judge had indicated complete disbelief of the testimony of the bridge tender who had contended that he never heard the Schoellkopf's signals until approximately the time she dropped anchor.

Thus as to the chief witness for each respondent (each of whom obviously knew more about the negligence charged than anyone else), the District Judge found reason in the testimony for disbelief. No appeal having been taken by Copper Range Railroad Company, our concern in this appeal lies primarily with his finding of negligence against American Steamship Company.

As to this, appellant steamship company contends:

1) That as a matter of admiralty law, the conduct of the Schoellkopf, her captain and crew, could not be found negligent. Clement v. Metropolitan West Side El. Ry. Co., 123 F. 271 (C.A.7, 1903); City of Cleveland v. McIver, 109 F.2d 69 (C.A.6, 1940).

2) That if it was negligent in any respect, the negligence was so slight as to be subject in admiralty law to being disregarded as against the clear negligence of the railroad which sufficiently accounted for the full damage. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893).

As we read the Clement and the McIver cases, they do not establish an unqualified right for a ship to proceed on the assumption that a drawbridge will open on signal. Both opinions refer to a ship proceeding under "slow speed." Clement states the qualified presumption thus:

"If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding (City of Chicago v. Mullen, 54 C.C.A. 94, 116 Fed. 292), but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened (Manistee Lumber Company v. City of Chicago [D.C.] 44 Fed. 87; Central Railroad Company of New Jersey v. Pennsylvania Railroad Company, 8 C.C.A. 86, 59 Fed. 192), when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern." Clement v. Metropolitan West Side El. Ry. Co., supra, 123 F. at 273.

It is clear, however, that in the instant case the qualified presumption that the bridge would open on signal was more sharply limited by different facts. The federal regulation required ships to slow so as to be able to stop. It also provided for the bridge to give a prompt responsive signal either to indicate that it was opening or that it was not. No such signal having been given when the Schoellkopf first signaled for the lift, the Schoellkopf was on notice that something was wrong. Indeed, her captain testified that after his signals and at a point 6,500 feet from the bridge, he realized the bridge was not going to open:

"The Court: But you were about 200 feet west of Buoy No. 41, channel marker 41, when you realized that the bridge was not going to open, weren't you?

"The Witness: Yes, sir."

■ Although in this regard there is other inconsistent testimony from the same witness, such inconsistencies are generally for the trial judge to resolve. American Steamship Co. v. Great Lakes Towing Co., 333 F.2d 426 (C.A.7, 1964), cert. denied, 379 U.S. 889, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

And there is expert opinion evidence from another Great Lakes master that that was the point when backing and filling to stop the ship should have been started:

"The Court: If I understand you correctly, captain, it is your opinion that, not receiving a response from the bridge, you should start your backing and filling operation as soon as possible when you fail to receive a response after signaling the bridge and signaling danger signals?

"The Witness: Yes, sir.

"The Court: And if you are a mile away, you should start it then?

"The Witness: Yes, sir.

"The Court: That is all. You may step down."

There is also evidence (although there is other evidence to the contrary) from which the District Judge could have concluded that despite the ship's signals and the failure of the bridge to answer, the Schoellkopf proceeded for some time without any effort to stop.

Thus the Second Mate testified:

"Q You heard the ship's signal sound, did you not?

"A Yes, sir.

"Q And was there more than one signal blown for the bridge, whatever it might have been?

"A There was a signal for the bridge blown, and I believe it was blown a second time, and danger signal was sounded, and almost immediately we blew for the bridge again. And, in fact, the whistle was blowing practically continuously for a period of close to 10 minutes, I would say. It was a long time.

"Q Did there come a time, Mr. Dix, when Captain Wilhelmy ordered you to forecastle deck?

"A Yes, sir.

"Q What did he tell you to do?

"A He said that 'It looks like they ain't gonna open the bridge,' or something similar to that; 'you go down and stand by the anchor, we may have to use it.' "

*     *     *     *     *     *

"Q And was the anchor eventually let go, dropped?

"A Yes, sir.

"Q Which anchor?

"A Port anchor.

"Q Do you have any recollection as to the headway of the vessel, speed she was going ahead, at the time that anchor was let go?

"A Possibly three to five miles an hour, maybe; about that.

"Q Before you left the pilothouse, had you noticed the captain signal for reverse engines?

"A I do not recall."

And the captain himself testified as to the way the ship still maintained when he dropped the anchor:

"The Court: How did your anchor happen to drag for 500 feet?

"The Witness: There was still forward motion on the ship.

"The Court: You weren't in danger from your forward motion, were you?

"The Witness: I was going to go and hit the bridge.

"The Court: If you hadn't dragged the anchor, would you have hit the bridge?

"The Witness: Yes sir.

"The Court: So you had to drop the anchor and drag it in order to stop that vessel without hitting the bridge?

"The Witness: Yes, sir."

■ Although appeals in admiralty cases are described as trials *de novo*, nonetheless the findings of fact of the trial judge are respected unless we can say they are clearly erroneous.

The United States Supreme Court has stated the rule of review thus:

"In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure [28 U.S.C.A.] Boston Ins. Co. v. Dehydrating Process Co., 204 F.2d 441, 444 (C.A. 1st Cir.); C. J. Dick Towing Co. v. The Leo, 202 F.2d 850, 854 (C.A. 5th Cir.); Union Carbide & Carbon Corp. v. United States, 200 F.2d 908, 910 (C.A. 2d Cir.); Koehler v. United States, 187 F.2d 933, 936 (C.A. 7th Cir.); Walter G. Hougland, Inc. v. Muscovalley, 184 F.2d 530, 531 (C.A. 6th Cir.), cert. denied, 340 U.S. 935 [71 S.Ct. 490, 95 L.Ed. 675]; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 126 F.2d 992, 994–995 (C.A. 2d Cir.). A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' United States v. Oregon [State] Medical Society, 343 U.S. 326, 339 [72 S.Ct. 690, 698, 96 L.Ed. 978]; United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 541, 92 L.Ed. 746]." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).

See also Federal Insurance Company v. S.S. Royalton, 328 F.2d 515 (C.A.6, 1964); The City of Cleveland v. McIver, supra.

■■ We cannot say on the record we have reviewed that the findings of fact of the District Judge were clearly erroneous. There is convincing evidence that the Schoellkopf proceeded into a position of danger without stopping or trying to stop after her captain knew that the bridge was not answering his signals and that the bridge warning lights showed plainly that it was closed to his ship. Appellant cannot claim the benefit of the *in extremis* rule (The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851); The City of New York, supra), when the emergency is one which appellant's agents helped materially to create.

In The City of Cleveland v. McIver, supra, and Pennsylvania Railroad Company v. S.S. Marie Leonhardt, 320 F.2d 262 (C.A.3, 1963), relied on by appellant, the courts concerned assessed all of the damages against the bridge owners after finding circumstances which constituted invitations to the ships to proceed. In the instant case we find no such circumstances. The bridge remained absolutely silent with its warning lights plainly visible all the while. We believe that the District Judge's findings of facts fully justified joint judgment against the railroad company and the steamship company. Great Lakes Towing Co. v. Masaba S.S. Co., 237 F. 577 (C.A.6, 1916).

Affirmed.