398 F.2d 204
 EMPIRE SEAFOODS, INC., Appellant-Appellee,
v.
Carl R. ANDERSON et al., Appellees-Appellants.
Carl R. ANDERSON and Gerritt A. Gates, Appellants-Appellees,
v.
EMPIRE SEAFOODS, INC., Appellee-Appellant.
CLEARY BROS. CONSTRUCTION COMPANY, Appellant-Appellee,
v.
EMPIRE SEAFOODS, INC., et al., Appellees-Appellants.
 No. 24536.
 United States Court of Appeals Fifth Circuit.
 March 18, 1968, As Modified on Rehearing and Rehearing En
Banc Denied June 27,1968, Rehearing En Banc Denied
July 30, 1968, Certiorari Denied Dec. 9,
 
 Richard F. Ralph, Harry W. Lawrence, Miami, Fla., Ralph & Anderson, Miami, Fla., of counsel, for appellant.
 Roland R. Parent, Smathers & Thompson, Miami, Fla., Attorneys for Appellant-Appellee, Cleary Bros. Construction Company, for Cleary Bros.
 Robert E. Hathaway, Sam D. Phillips, Phillips & Hathaway, West Palm Beach, Fla., for appellees Carl R. Anderson and Gerritt A. Gates.
 Before JONES, WISDOM and DYER, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 Because the tip of the starboard outrigger of Empire's[1] shrimper 'Bora Bora' struck the leaf of a bascule bridge under construction by Cleary, which spanned the channel of the Florida Intercoastal Waterway, the manual crank used to raise the leaf was violently reversed causing injury to its operators, Anderson and Gates, for which they recovered damages reduced by the compartive negligence rule against Empire, who in turn recovered one-half from Cleary in the Admiralty Court below. Empire recovered, under the divided damages rule, for the damages suffered by its vessel. Nobody is happy, and everybody has appealed.
 
 
 2
 Empire asserts that it should have been exonerated from fault or its liability limited; failing that, its cross libel against Anderson for indemnity should have been sustained; and in any event the damage to the Bora Bora should not have been borne equally by Empire and Cleary, but should have been divided in fourths because Anderson, Gates, Cleary and Empire were all at fault, and by the same token Anderson and Gates' damages should have been divided by thirds instead of by halves.
 
 
 3
 Cleary complains of error in admitting into evidence the depositions of Anderson and Gates taken prior to the time Cleary was impleaded as a party; denies negligence or proximate cause; disputes its responsibility to contribute to or indemnify Empire for any part of claimants' damages; and finally agrees with Empire that the divided damages rule was not correctly applied by the District Court.
 
 
 4
 Anderson and Gates object to the decree entered because it does not permit them to pursue and satisfy one-half of their damages directly against Cleary, but requires them to collect only from Empire and gives the latter a recovery over against Cleary for one-half of what Empire has paid to claimants.
 
 
 5
 The court below made detailed findings of fact and conclusions of law. The facts may be capsulated, enlarging upon them as need be in the discussion that follows.
 
 
 6
 Empire was the owner of the shrimp boat Bora Bora, captained and navigated by Thomas, who took delivery of her at the builder's yard in St. Augustine, Florida, for a voyage to Brownsville, Texas. While proceeding southward on the Intercoastal Waterway the tip of the starboard outrigger collided with the westerly leaf of a new bridge being constructed in an east-west direction across the north-south Intercoastal Waterway north of Fort Pierce, Florida. The east pier of the bridge was not fully constructed, and no easterly leaf of the bridge had been installed. There was no electrical machinery operable, and the westerly leaf was raised and lowered by the bridge steel crew (Anderson, Gates and two others) by means of cranks located inside the westerly pier from which the view to the north was practically blocked.
 
 
 7
 Cleary was constructing the bridge for the State of Florida and was the employer of Anderson and Gates, both of whom received from Cleary Florida Workmen's Compensation and medical benefits in respect to their injuries.
 
 
 8
 Empire filed a petition for exoneration or limitation.[2] Anderson and Gates answered and filed claims. Empire impleaded Cleary.[3] Empire also filed a cross-libel against Anderson.
 
 
 9
 The District Court determined the amount of damages due to Anderson and Gates, reduced their recovery by 20% Under the comparative negligence doctrine, and required neither to contribute to the injuries and damage of the other. The court further provided in the decree that Anderson and Gates should recover solely against Empire and Empire was to recover one-half that amount from Cleary after payment. Decree was entered against Cleary for one-half the damage to the Bora Bora. The cross libel of Empire against Anderson was dismissed by the court. Empire does not appeal from this dismissal.
 
 
 10
 Empire's Petition for Exoneration or Limitation
 
 
 11
 Empire's petition for exoneration, based on an asserted lack of negligence on its part, was properly denied. The evidence, as discussed below, fully supports the District Court's finding of negligence attributable to Empire.
 
 
 12
 The Bora Bora was an oil screw vessel of 74.48 gross tons with a registered length of 65.9 feet, beam of 18.2 feet and draft of 8.3 feet. Aft of the enclosed pilot house and attached to the mast were dual steel outriggers which were customarily carried in an upright position, except when actually engaged in fishing. From the pilot house the tip of the outriggers could not be seen. In fact, if the captain looked aft through the house he could see only a small portion of the outriggers where they were affixed to the mast about 4 1/2 feet above the deck level.
 
 
 13
 On the day of the collision Thomas knew nothing about the Florida Intercoastal Waterway and painfully little either about the vessel he was navigating or the conditions under which it was being operated. At one time he described the outriggers as being 26 feet and another time as 28 feet in height. With reference to the distance from the deck to the place where the outrigger was hinged to the mast he vacillated between 50 and 54 inches. His estimate of the vessel's freeboard was six feet, varying more or less by a foot. Thomas estimated 40 feet of clearance under the leaf of the bascule bridge on the course he was following. Taking his maximum freeboard of 7 feet, distance from deck to hinges on the mast where the outriggers were affixed as 4 1/2 feet, and the height of the outriggers as 28 feet, the tip of the outriggers would be 39.5 feet, leaving a clearance of 6 inches. On the other hand, taking the builder's estimate that the outriggers extended above the deck 27.5 feet, and the freeboard was 5 feet (the minimum approximated by Thomas) the tip of the outriggers could have been 32.5 feet above the water leaving a clearance of 7.5 feet. But of course there was no clearance at all. From this it is self-evident that Thomas had no accurate knowledge about the height of the outriggers and the distance needed for clearance.
 
 
 14
 Thomas thought that the vessel's beam was 16 instead of 18.2 feet. He didn't know the direction of the wind or whether the tide was high, low, ebb or flow. Actually, the wind was from the north and the tide was running with the vessel. The only other member of the crew was his wife who was a beatician by trade. Thomas didn't know where she was at the time of the accident and hadn't seen her for at least 2 1/2 miles before the collision with the bridge. Whatever she was doing, wherever she was and however incompetent she may have been, the fact is that she did not act as a lookout. In the particular circumstances of this case, i.e., the captain's unfamiliarity with the Intercoastal Waterway and the many bridges over it and the location of the outriggers aft of the pilot house where they could not be seen by Thomas, the District Court correctly found that the failure to provide a lookout constituted negligence.
 
 
 15
 Approximately one hundred feet north of the bascule bridge under construction was an existing swing draw bridge attended by a tender. When closed the swing draw bridge extended east-west, parallel to the bascule bridge; when opened it turned in a counter-clockwise direction until the roadway extended in a north-south direction. At the time in question vessels could pass only on the westerly side of the open bridge.
 
 
 16
 On August 28, 1963, the Bora Bora approached the bridges from the north during morning daylight hours at a speed of ten miles per hour. The weather was clear and visibility good. While five miles away Thomas observed both bridges. At approximately 2 1/2 miles he saw that the bascule bridge was under construction. When Thomas was between a quarter to a half mile north of the swing bridge he signalled for the bridge to open and reduced his speed. The tender on the swing bridge signalled the Bora Bora to stop. The draw of the bascule bridge was clearly visible at the time and the westerly leaf was somewhere between horizontal and a 45 degree angle up from horizontal. Anderson, Gates and two others who were installing the roadway on this leaf cleared their tools when the Bora Bora was about 1/3 of a mile away and went to the machine room where they began to raise the leaf manually. At no time, however, did Thomas observe the leaf being elevated.
 
 
 17
 After an exchange of signals with the tender on the swing bridge and while Thomas was still several hundred feet to the north, the swing bridge opened and he passed through. About this time Thomas estimated that between the water and the leaf of the bascule bridge he had approximately forty feet of clearance. He knew that the clearance under the bridge would be close but proceeded nevertheless, although at the speed he was then going he said he could have stopped within 72 feet. At this same time the tender on the swing bridge (about 100 feet from the bascule bridge) could see that the Bora Bora could not possibly clear the bascule bridge.
 
 
 18
 Although Thomas estimated his speed at a constant 3 miles per hour from north of the swing bridge, through it and then through the bascule bridge, there was substantial evidence which was credited by the lower court, that the Bora Bora came through at cruising speed with no deceleration and created quite a wake.
 
 
 19
 Under the bascule bridge the horizontal clearance was 63 feet between the fender system on the westerly side to the old fender system on the easterly side. Thomas maintained that he navigated within 2 or 3 feet of the westerly face of the fenders on the east side of the channel. Had he done so there would undoubtedly have been sufficient clearance. The more impelling evidence of what transpired placed the vessel 12 to 15 feet west of the easterly fender system, which put the starboard side of the Bora Bora slightly west of the center line of the channel under the bascule bridge. The physical facts support this. The starboard outrigger struck the leaf near its northern edge 8 to 10 inches from the easterly end of its, causing the vessel to veer to the west. When the vessel reached a point several feet north of the southern edge of the leaf the outrigger again struck the leaf and the force that was apparently transmitted through the cables reversed the manual crank being operated by Anderson and Gates.
 
 
 20
 As the facts related above show there was substantial evidence from which the District Court could and did find that exoneration of Empire should be denied because Thomas, its employee, was guilty of negligence in the operation and navigation of the Bora Bora which substantially and proximately contributed to the collision.
 
 
 21
 We need not pause long to conclude that the lower court properly held that Empire should be denied limitation. It had a non-delegable duty to provide a qualified master and crew for the intended United States, 2 Cir. 1949, 178 F.2d 243, 252; see, Admiral Towing Co. v. Woolen, 9 Cir. 1961,290 F.2d 641, 646; Navegacion Castro Riva v. The M. S. Nordholm, E.D.La. 1959, 178 F.Supp. 736, 741 n. 19, aff'd 5 Cir. 1961, 287 F.2d 398.
 
 
 22
 Noble Hardee, the president of Empire, asked his brother, W. L. Hardee (who had no connection with Empire) to secure a captain for the Bora Bora. W. L. secured Thomas who took his wife along as a cook. W. L. had known Thomas for about ten years and Thomas had been employed as a shrimp boat captain by one of W. L.'s corporations for about four years. Noble finally learned that Thomas was the captain of the Bora Bora at the time Thomas took delivery of her in St. Augustine. On the basis of Thomas' reputation in Louisiana and Texas, both the Hardees considered Thomas as capable. However, the evidence clearly shows that those acting for Empire knew that the experience of Thomas in navigating inland waters was quite limited; knew that he was totally unfamiliar with the Inter-Coastal Waterway of Florida; knew that the outriggers would be in a vertical position and that the vessel was so constructed that the captain, while steering, could not see the upper portion of the outriggers; knew that Thomas had no builders' measurements of the vessel's freeboard or outrigger height upon which he could make determinations of clearance; and knew or should have known that to safely navigate the vessel it was necessary to furnish a competent captain and lookout.
 
 
 23
 We need not iterate what we have said about the negligence of Thomas in our discussion of exoneration. Nor need we dwell on the absence of a lookout, because there was a complete lack of evidence that Mrs. Thomas was qualified to act in that capacity, or that she attempted to fill that position.
 
 
 24
 We are convinced of the correctness of the finding by the District Court that the vessel was unseaworthy in that Thomas was not qualified; a qualified lookout was not aboard; such circumstances contributed to the collision, and there was privity and knowledge[4] on the part of Empire's president in the negligence causing the accident.
 
 
 25
 We cannot say that a decree, based upon such evidence, denying exoneration or limitation of liability is clearly erroneous, and this is the test we must apply. McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.
 
 Negligence of Cleary
 
 26
 On the morning of the collision, Anderson, Gates and two others were working on decking the westerly leaf of the bascule bridge. Anderson, the foreman, had received no instructions from Cleary concerning the raising or lowering of the draw. No one was assigned the specific duty of keeping a lookout. The steel crew had nothing with which to signal vessels. Anderson first saw the Bora Bora about 8 miles away and Gates saw it about 2 to 3 miles distant. The crew kept working until the vessel was about 2 1/2 miles away. They then gathered up their tools (which took about 10 minutes) and then went below into the machinery room to manually crank the draw. This room has no opening to the north so their view was limited to a distance in that direction of about 100 feet to the location of the swing bridge. They heard the vessel blow while they were cranking. They had expected to manually open the leaf about three-fourths of the way but when they next saw the vessel it was about 100 feet away and the draw was raised only about onefourth of the way. No attempt was made to signal the Bora Bora or the tender on the swing bridge.
 
 
 27
 Clearly Cleary breached its statutory duty not to unreasonably obstruct navigation upon the waters over which the bascule bridge was being constructed. There were no means provided for signalling and communicating with vessels, or with the swing bridge which being located 100 feet north controlled southbound traffic for the bridge under construction. 33 U.S.C.A. 494, 499, 512; 33 C.F.R. 203.240(a), (b)(2) and (f). The cranking was so arduous that the four men could not perform this task over an extended period of time without pausing to catch their breath. During the time they were cranking there was no lookout on the bridge, no communication with the swing bridge nor any observation or means of signalling the vessel. Cleary failed to give the crew any instructions concerning the operation of the draw or to establish a procedure between the crew on the bascule bridge and the tender on the swing bridge for the opening of the draw to give an oncoming vessel full use of the navigable channel or give an appropriate signal that the leaf was not and could not be opened sufficiently and promptly. Circle Line Sightseeing Yachts, Inc. v. City of New York, 2 Cir. 1960, 283 F.2d 811, cert. denied, 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191; City of Cleveland v. McIver, 6 Cir. 1940, 109 F.2d 69, 72; Penn. R.R. v. S. S. Marie Leonhardt, E.D.Pa.1962, 202 F.Supp. 368; aff'd 3 Cir. 1963, 320 F.2d 262. The fault of Cleary was abundantly established and substantially contributed with that of Empire to the collision and resultant damages.
 
 
 28
 The Introduction of Anderson and Gates' Deposition Over Cleary's Objection That They Were Taken Before Cleary Was Impleaded
 
 
 29
 Hewing to an interpretation of Admiralty Rule 30A[5] that would inflexibly limit the use of a deposition against a part only to those instances where the party was present or represented at the taking of the deposition, or in the alternative, had due notic thereof, Cleary insists that the depositions of Anderson and Gates taken by Empire between the time that Empire filed its petition to implead Cleary and the time Cleary was brought into the litigation and made a party to the suit were inadmissible against Cleary when offered by Empire to establish the material allegations of the impleading petition. We disagree.
 
 
 30
 When Cleary was impleaded by Empire the District Court gave Cleary time to review the deposition of Anderson and Gates that had been previously taken, with leave thereafter to take such depositions as Cleary felt were indicated. Cleary was at that time cautioned by the lower court that the depositions would be received at the time of trial with the opportunity given to Cleary to object, move to strike and to read portions of the depositions if it so desired. Notwithstanding this, Cleary did not take the depositions of either Anderson or Gates before trial, although they were both available. Cleary did not call either claimant to testify at trial, where it had full opportunity to interrogate them by leading questions and to contradict and impeach them if possible.[6] Cleary did not at the time of trial, nor does it now question, contest, or seek to refute any of the factual bases of its liability contained in the deposition of the claimants.
 
 
 31
 The rule upon which Cleary relies was promulgated to protect the right of cross-examination and to guard against prejudice.[7] It cannot be invoked merely to assert form over substance. Rule 1, Fed.R.Civ.P. Under the circumstances here present the ruling of the District Court was correct, was not prejudicial, and was consistent with a just, speedy and inexpensive determination of the case. Cf., Gloria S.S. Co. v. Smith, 5 Cir. 1967, 376 F.2d 46, 48.
 
 
 32
 The Applicability of the Divided Damages Rule
 
 
 33
 Cleary asserts that it was error for the district Court to apply the divided damages rule in a manner which rendered Cleary liable for half the damages paid by Empire to Anderson and Gates.
 
 
 34
 Cleary's inferential argument that there was no fault on the part of the bridge has been shown to be without merit. Cleary next seems to contend that this was not a maritime collision because the accident and injuries occurred on land; the undertaking by Cleary to construct the bridge was not a maritime contract; and the work being performed was not maritime in character. The short answer to these arguments is that under the Extension Act, 46 U.S.C.A. 740,[8] and under the Limitation Act, 46 U.S.C.A. 185[9] the District Court had admiralty jurisdiction over the collision and maritime law applied.[10] It matters not whether the collision be between vessels, or vessel and bridge, it is a maritime collision to which the divided damage rule applies, e.g., Circle Line Sightseeing Yachts, Inc. v. City of New York, 2 Cir., 1960, 283 F.2d 811; Gilmore & Black, The Law of Admiralty, 7-17 (1957).
 
 
 35
 Equating a provision in the Florida Workmen's Compensation Law, section 440.11, F.S.A.[11] with section 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. 905, which provides that the liability of the employer under the compensation act shall be exclusive, Cleary argues that it cannot be burdened with a liability for injuries sustained by its employees in addition to the liability imposed upon it by the compensation act by using the divided damages rule to do indirectly that which cannot be done directly. We are unpersuaded.
 
 
 36
 The longshoremen and joint tort feasor cases relied upon by Cleary are not helpful because the legal relationships of the parties in those cases and the relationship in the case sub judice, involving a maritime collision between a vessel and a bridge, are not comparable and cannot be analogized.[12] This is succinctly pointed up in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, in which the Court said:
 
 
 37
 Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties. The maritime rule is of ancient origin and has been applied in many cases, but this Court has never expressly applied it to non-collision cases.
 
 
 38
 Id. at 284, 72 S.Ct. at 279.
 
 
 39
 The District Court correctly concluded, under Weyerhaeuser Steamship Co. v. United States, 1963, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1, that this was an appropriate case for the application of the divided damages rule. In Weyerhaeuser there was a mutual fault collision between the privately owned 'F. E. Weyerhaeuser' and the 'Pacific', owned by the United States. The District Court included in the damages to be halved the sum of $16,000 paid by Weyersaeuser in settlement of a personal injury claim of a government employee aboard the Pacific, out of which settlement the employee had repaid the government the amount of a compensation award the employee had received under the Federal Employees' Compensation Act. The United States objected to the inclusion of the $16,000, contending that these damages were not subject to equal division because of the exclusionary provision of section 7(b) of the Federal Employees' Compensation Act which is similar to section 5 of the Longshoremen's Compensation Act. The Supreme Court cited The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801, in which the damages were divided notwithstanding the fact that the cargo had no direct action against its carrying vessel because errors in navigation by the carrying vessel did not, under the Harter Act[13] render the vessel owners liable for loss or damage, and the Court then stated:
 
 
 40
 In this case, as in The Chattahoochee, we hold that the scope of the divided damages rule in mutual fault collisions is unaffected by a statute enacted to limit the liability of one of the shipowners to unrelated third parties. Weyerhaeuser Steamship Co. v. United States, supra at 604,[14] 83 S.Ct. at 930.
 
 
 41
 In applying the divided damages rule to the facts in this case the District Court found Empire, Cleary, Anderson and Gates all guilty of some negligence or fault which contributed to the collision. The personal injury recoveries of Anderson and of Gates were reduced 20 percent each according to the principle of comparative negligence. The lower court divided the vessel's damage between Empire and Cleary.
 
 
 42
 Empire and Cleary argue that the negligence or fault of Anderson contributed not only to his own injury but also to the injury to Gates and damage to Empire's vessel; thatthe negligence or fault of Gates contributed to his own injury as well as to the injury of Anderson and to Empire's vessel; and that because of these facts the District Court erred in not providing for contribution by Anderson or Gates respecting the vessel damage, or for Gates to contribute to Anderson's recovery, or for Anderson to contribute to Gates' recovery, all under the principle of divided damages.
 
 
 43
 At the outset, we need not consider the fact, as Gates suggests we should, that no claim was made against Gates for divided damages, because when the parties are before an Admiralty Court the controversy is to be determined on the merits as it appears from the proof, absent some surprise or injury to a party, regardless of the technicalities of pleading. See Richfield Oil Corp. v. United States, 9 Cir. 1957, 248 F.2d 217, 224; Dampskibs Aktieselskabet Thor v. Tropical Fruit Co., et al., 2 Cir., 1922, 281 F. 740; The Volunteer, 2 Cir., 1906, 149 F. 723.
 
 
 44
 The theory of divided damages advanced by Empire and Cleary is both intriguing ann novel because it treats Anderson and Cleary not as persons but as vessels, and then proceeds to divide the vessel damage by fourths and the damages of Anderson & Gates, reduced by their own fault, by thirds. There is no case support for this theory.[15] Empire attempts to rationalize the theory it espouses as follows: 'In Weyerhaeuser, as in the case of innocent cargo, the sole personal injured party was not one of the joint tort feasors, and the Admiralty division of one-half each of the settlement could be and was obtained between the two joint tort feasors.'[16] But here, Empire argues, Anderson and Gates are not innocent parties but are also tort feasors, together with Empire and Cleary, and therefore the damages cannot be assessed only against Empire and Cleary but must be divided between them all. Although ingenious, this theory fails, for two reasons. Anderson and Gates are not vessels nor can they be so categorized under the Extension Act. For the purpose of maritime relationships under the Act, in the context of this case, they are treated as the 'crew' of the bridge which, in turn, is treated as a vessel. They therefore cannot be treated as vessels, for divided damages purposes. Moreover, Empire's theory seems to confound the comparative damage rule and make Weyerhaeuser applicable only in those instances where the third party involved was faultless. Under the comparative negligence doctrine, where the negligence by both parties is concurrent and contributes to injury, and the fault of one (Anderson and Gates) is less than the other (Empire), recovery is not barred, but the claimant's damages are diminished proportionately (as was done in this case). Cf., Haynes v. Rederi, A/S Aladdin, 5 Cir. 1966, 362 F.2d 345, 348; O'Leary v. United States Lines Co., 1 Cir. 1954, 215 F.2d 708, 712. This doctrine, of course, does not mean that Empire is in any degree absolved from its own tortious conduct or may benefit damage wise from the application of the comparative negligence rule by recovery or offset against the claimants for the damages sustained by the Bora Bora. Neither is the rationale of Weyerhaeuser affected. Where each of the personally injured claimants 'was guilty of negligence, which contributed to his own injury to a degree of twenty percent thereof'[17] his damages are reduced by that amount, and the divided damages rule in mutual fault collisions is then applied. In Weyerhaeuser the full amount of damages to the third party was subject to the divided damages rule; but it must be remembered that in that case the third party was completely innocent. This view is supported, at least inferentially, by a long line of decisions which have held that, 'where an injury is due to the fault of two vessels, the liability is not joint, but either is answerable to the injured party for the whole damage sustained by him, and he may proceed against one vessel alone, and, if he did not himself contribute to the disaster, may recover judgment for the full amount of his loss.' The Ruth, D.Ore. 1910, 178 F. 749, 752; accord, Briggs v. Day, S.D.N.Y. 1884, 21 F. 727, 730-31.
 
 
 45
 Where, as here, the injured parties did contribute in some degree to their own injury their damages must be reduced proportionately before the divided damages rule is applied. In Wright v. Cion Corp. Peruna Desvapores, S.D.N.Y.1959, 171 F.Supp. 735, the 'Urubamba' owned by Cion collided with the tug 'Coot' owned and captained by Wright. Wright was lost and the mate Hughes was injured as a result of the accident. Wright's widow sued Cion for, among other things, the loss of the tug and the death of Wright. The mate sued Cion and Wright's estate for damages for personal injuries. The court held that the owners of the vessels must divide their damages irrespective of the degree of fault of each. It then held the decedent Wright was guilty of fault to a degree of 70% Of the total fault involved and further found the mate faultless. After determining the value of the tug, the court reduced by 70% The amount found to be due Wright's estate for the death claim and assessed the mate full damages against both respondents. The court then said:
 
 
 46
 Respondent Cion has requested that the amounts paid by either the estate of Wright or Cion in satisfaction of any judgment obtained herein in favor of third parties be considered as a part of the damages resulting from the collision and divided between the estate and Cion in accordance with the divided damages rule. This request is entirely proper and accordingly, the decree to be entered herein shall contain such a provision.
 
 
 47
 We are convinced that the District Court in the case sub judice properly applied the divided damages rule in this mutual fault situation, to the extent that it included, with the amount of the vessel's damage, the personal injury recoveries of Anderson and Gates, as reduced by the comparative negligence doctrine, in the amount subject to the rule.
 
 
 48
 One tag end remains. Cleary points out that although the District Court concluded that Anderson and Gates should be required to pay Cleary the sums received by each of them for workmen's compensation, neither in its order, nor in the final decree was any provision made for the recovery by Cleary of the past or future commuted value of such payments. In dividing the damages, Cleary argues, these losses which it has and will suffer should be taken into account. Anderson and Gates do not contest Cleary's right under the Florida Workmen's Compensation Law, section 440. 39 (1), (2), (3), F.S.A. to an apportionment of the recovery received by them and concede in their brief that 'cleary shall be reimbursed for that (the payments made to them) from the recovery of claimants. * * *'[18]
 
 
 49
 No doubt the District Court took note of the fact that under the Florida Workmen's Compensation Act the recovery of the employee is based upon the principle of equitable distribution between the employee and employer, section 440.39(3)(a) F.S.A.[19] This statute differs from the Federal Compensation Act, where, in a longshoreman case, the employer or compensation carrier is repaid in full for its payments. Haynes v. Rederi A/S Aladdin, 5 Cir., 1966, 362 F.2d 345. Whatever share of the recovery Cleary is to receive as equitable distribution, and whatever the effect of the recovery by Anderson and Gates on deficiency compensation, to be determined according to the Florida Act, will yet have to be the subject of a hearing and disposition by the District Court. Until this has been accomplished the lower court should, upon remand, enter such an order as would be appropriate to insure the payment by Anderson and Gates to Cleary of the equitable distribution.
 
 The Decree Entered by the District Court
 
 50
 The decree entered by the court below limited Empire's recovery from Cleary to such amounts as are paid by Empire to the claimants. The District Court reasoned that since Cleary was impleaded by Empire its liability (not to exceed onehalf) was by way of indemnity only. The court was also disturbed that any direct liability against Cleary would run afoul of the exclusivity of the Florida Workmen's Compensation Act. The motion of claimants for the entry of a decree providing for direct liability against Cleary for one-half the damages was therefore denied.
 
 
 51
 Cleary argues that Anderson and Gates have no standing to appeal from the portion of the decree entered against Cleary in favor of Empire because the claimants are not aggrieved by it. Claimants, on the other hand, assail the decree as affecting their substantial rights, contending that if Empire is unable to pay the full amount of the damages to the claimants, the impleaded respondent Cleary will not be required to make up the deficiency, but, instead, will benefit thereby since it is required to pay only one-half of the amounts paid by Empire.
 
 
 52
 We have no doubt that the claimants have standing as aggrieved parties to assert the error complained of on appeal. Furthermore, we agree that the form of the decree must be changed.[20] The fact that Cleary was impleaded by Empire in the first instance does not confine its liability to that of indemnity to Empire where, as here, the divided damages rule for mutual fault applies. The rule is well settled, as succinctly stated in Smith v. Nicholson Transit Co., W.D.N.Y., 1941, 39 F.Supp. 795, that,
 
 
 53
 Where, as here, two parties are responsible for injury to a third, each is primarily liable for one-half the damages. The respondent and the respondent-impleaded should each pay one-half the damages, and if any part of the damages assessed against one of the respondents cannot be collected from that respondent the balance may be assessed against the other respondent in addition to the one-half which that respondent is compelled to pay in the first instance. Benedict on Admiralty, Fifth Ed., Vol. 1, section 416; The Atlas, 93 U.S. 302, 23 L.Ed. 863; The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91; The Sterling, 106 U.S. 647, 1 S.Ct. 89, 27 L.Ed. 98; Great Lakes Towing Co. v. Masaba S.S. Co., 6 Cir., 237 F. 577.
 
 
 54
 Id. 39 F.Supp. at 797. 'The decree, therefore, should provide that each vessel * * * pay one-half of the entire damages, interest and costs, * * * and it should further provide that any part of the one-half damages assessed against either vessel, which libelant may not be able to collect from that vessel, be assessed against the other vessel, in addition to the one-half which she is in the first instance compelled to pay.' Benedict, Admiralty, 416 (6th ed. 1940).[21]
 
 
 55
 Affirmed in part and reversed in part and remanded for further proceedings.
 
 ON PETITION FOR REHEARING
 DYER, Circuit Judge:
 
 56
 Cleary Bros. Construction Company has petitioned for rehearing en banc, urging for the first time that the decree entered by the District Court correctly applies the divided damages rule providing for recovery by Anderson and Gates from Empire, and recovery by Empire against Cleary for one-half the losses sustained by Empire in this respect.
 
 
 57
 Upon reconsideration, we are convinced that what we said about the District Court decree in our original opinion was appropos only to those instances where, aside from a statutory prohibition, and innocent third party is injured by the mutual fault of vessels in a collision. The Atlas, 93 U.S. 302, 23 L.Ed. 863; The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91.
 
 
 58
 But where a statute such as the Florida Workmen's Compensation Act here, the Federal Employers' Compensation Act in Weyerhaeuser S.S. Co. v. United States, 1963, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1, and the Harter Act in The Chattahoochee, 1889, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801, denies direct recovery against one of the two vessels (Cleary, the employer of Anderson and Gates), recovery can be had only against the other vessel for all of the damages sustained by the innocent party. Aktieselskabet Cuzco v. The Sucarseco, 1935, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942; United States v. Atlantic Mutual Ins. Co., 1952, 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907; New York and Cuba Mail S.S. Co. v. American S.S. Owners' Mut. P & I Ass'n, Inc., 2 Cir. 1934, 72 F.2d 694.
 
 
 59
 We have found, as in Weyerhaeuser, and in The Chattahoochee, that this case is a proper one for the application of the divided damages rule. Empire is in essentially the same position as Weyerhaeuser S.S. Co., and as the noncarrying vessel in The Chattahoochee. Gates and Anderson occupy the same position with respect to Cleary as did the Federal employee in Weyerhaeuser to the United States Government, and as innocent cargo in The Chattahoochee to the carrying vessel, because there is a statutory bar to direct recovery in each instance. Empire's right to contribution is not due to Cleary's liability to Anderson and Gates but to Cleary's liability to Empire. In the division of damages between Empire and Cleary, mutually at fault in this collision, Empire, who must pay the damages to Anderson and Gates, may treat these damages as part of its own collision damages and recover from Cleary one-half the amount it pays Anderson and Gates.
 
 
 60
 It is therefore ORDERED that rehearing before the panel of this Court which heard the case on original hearing be and it is hereby granted, and the opinion is modified as herein stated. In other respects the Petition for Rehearing is DENIED and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is DENIED.
 
 
 61
 The decree of the District Court is in all respects
 
 
 62
 Affirmed.
 
 ON PETITION FOR REHEARING EN BANC
 PER CURIAM:
 
 63
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 
 [1]
 For convenience, Empire Seafoods, Inc., appeallant-appellee, the petitioner below, will be referred to as Empire; Carl R. Anderson, appellee-appellant, a claimant below, will be referred to as Anderson; Gerritt A. Gates, appellee-appellant, a claimant below, will be referred to as Gates; Cleary Bros. Construction Company, appellant-appellee, the impleaded respondent below, will be referred to as Cleary
 
 
 [2]
 Sections 4283, 4284 and 4285 of theRevised Statutes of the United States as supplemented and amended
 
 
 [3]
 General Admiralty Rule 56, now Rule 14(c), Fed.R.Civ.P
 
 
 [4]
 In admiralty "privity and knowledge' is a term of art meaning complicity in the fault that caused the accident,' Blackler v. F. Jacobus Transp. Co., 2 Cir. 1957, 243 F.2d 733, 735
 
 
 [5]
 The trial of this case was held on October 11-13, 1965. At that time the rules of procedure had not been unified. The pertinent portions of the rule than read: '(d) Use of Depositions. At the trial * * * any part or all of a deposition, so far as admissible under the Rules of Evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof * * * (2) The deposition of a party * * * may be used by an adverse party for any purpose.'
 
 
 [6]
 Rule 46A, General Admiralty Rules
 
 
 [7]
 Cleary's reliance upon Taylor v. Reder's A/S Volo v. Lavine Shipping Company, E.D.Pa.1966, 249 F.Supp. 326, is misplaced. There, as here, the deposition was taken before the third party was impleaded, but unlike the situation here the deponent died prior to trial. The court quite properly held the deposition in Taylor to be inadmissible because the third party never had the opportunity of cross examination
 
 
 [8]
 The Extension Act provides in pertinent part: 'The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.'
 
 
 [9]
 The Limitation Act provides in pertinent part: 'The vessel owner * * * may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter * * *. Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease.'
 
 
 [10]
 Cf., 1948 U.S.Code Cong.Service pp. 1898, 1899 (legislative history of the Extension Act)
 
 
 [11]
 Section 440.11 provides inter alia:
 'The liability of an employer prescribed in 440.10 shall be exclusive and in place of all other liability of such employer to the employee * * * and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death * * *.'
 
 
 [12]
 Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318; Lo Bue v. United States, 2 Cir. 1951, 188 F.2d 800, and American Mutual Liability Insurance Co. v. Matthews, 2 Cir. 1950, 182 F.2d 322, relied on by Cleary, all were claims for contribution from a joint tort feasor which were denied because the tort feasors were not joint wrongdoers in the sense that their negligence imposed a common liability upon them to the injured party. Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, allowed full recovery by the shipowner against the stevedore, the employer of the injured party, notwithstanding the compensation act because of a breach of the stevedores' contractual obligation to the shipowner. We, of course, have no similar relationship here. Halliburton Company v. Norton Drilling Co., 5 Cir., 1962, 302 F.2d 431, and Peak Drilling Co. v. Halliburton Oil Well Cementing Co., 10 Cir., 1954, 215 F.2d 368, are inapposite. In these non-maritime cases, a third party complaint for indemnity against the employer on the third party's claim of right to recover based on neligence was dismissed
 
 
 [13]
 46 U.S.C.A. 192. The substance of this provision was reenacted by Congress as section 4(2) of the Carriage of Goods by Sea Act, 46 U.S.C.A. 1304(2)(a)
 
 
 [14]
 Cleary attempts to distinguish Weyerhaeuser as follows: (1) This case, unlike Weyerhaeuser, is not a true mutual fault case between the owners of two ships; (2) Cleary has not been repaid the money paid by it to the claimants under the state Compensation Act, and (3) the claimants are not unrelated third parties. The facts simply belie the first asserted distinction except that Cleary had the custody and control instead of being the owner of the bridge. No case has been cited to us and we have found none that would vary our view that this is a distinction without a difference. We think the second is an irrelevant consideration, but in any event Cleary has a right to repayment under the Florida Workmen's Compensation Law, section 440.39(1), (2), (3), F.S.A. Concerning the third, the claimants are unrelated third parties in the sense that each employee, as in Weyerhaeuser, had no connection with the other party with whom the employee was initially at fault
 
 
 [15]
 All of the cases cited by Empire and Cleary have either to do with divided damages between vessels, The Eugene F. Moran, 1909, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600; Moran Towing & Transp. Co. v. Empresa Hondurena de Vapores, 5 Cir. 1952, 194 F.2d 629, cert. denied, 343 U.S. 978, 72 S.Ct. 1074, 96 L.Ed. 1370, diminishment of damages under the doctrine of avoidable consequences, Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, comparative negligence, Haynes v. Rederi A/S Aladdin, 5 Cir. 1966, 362 F.2d 345; The Max Morris, 1890, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586, or apportionment of damages in a sole fault collision, Pennsylvania R.R. v. The Beatrice, 2 Cir., 1960, 275 F.2d 209
 
 
 [16]
 Empire's Brief, p. 17
 
 
 [17]
 District Court's finding of fact
 
 
 [18]
 Brief of Anderson and Gates, p. 10
 
 
 [19]
 Factors not germane to compensation, such as pain and suffering, effect of contributory negligence and other circumstances enter into a determination of the equitable distribution under the Act. See e.g., Luby Chevrolet, Inc. v. Foster, 1965, Fla.App., 177 So.2d 510; U.S. Fidelity and Guaranty Co. v. Harb, 1965 Fla.App., 170 So.2d 64; Arex Indem. Co. v. Radin, 1954, Fla., 72 So.2d 393
 
 
 [20]
 With respect to workmen's compensation, suffice it to say (as we have previously pointed out in detail) that 'the full scope of the divided damages rule must prevail over a statutory provision, * * * like the one involved in the present case, * * *' United States v. Weyerhaeuser Steamship Company, supra, 372 U.S. at 603, 83 S.Ct. at 930; accord, 3 Benedict, Admiralty, 417b (6th ed. 1940)
 
 
 [21]
 The authorities state the rule in terms of 'innocent third parties.' While it might be argued that these authorities can have no application to the instant situation since Anderson and Gates were negligent, we are convinced that the reduction of their respective recoveries under the comparative negligence doctrine is to be considered full penalty for their fault and that they must, thereafter, be treated in the same manner as 'innocent third parties.' See text accompanying n. 17 supra