Rebecca R. WRIGHT, Executrix of the
Estate of John J. Wright, deceased,
Libelant,

v.

CION CORP. PERUNA DESVASPORES,
Respondent.

CORPORACION PERUANA DE VA-
PORES, Owner of the M.V. Uru-
bamba, Cross-Libelant,

v.

Rebecca R. WRIGHT, as Executrix of the
Estate of John J. Wright, deceased,
Cross-Respondent.

Howard A. HUGHES, Libelant,

v.

CION CORP. PERUNA DE VASPORES,
Respondent.

Howard A. HUGHES, Libelant,

v.

Rebecca R. WRIGHT, Executrix of the
Estate of John J. Wright,
Respondent.

United States District Court
S. D. New York.

Feb. 23, 1959.

Delaware River on December 9, 1956. As a result of the collision the tug sank, her captain and owner, John J. Wright, was lost and presumably drowned, and her only other crew member, the mate Howard A. Hughes suffered personal injuries.

Four actions are involved. Wright's widow, as executrix, sues the owner of the Urubamba *in personam* on behalf of the estate, for the property damage to the tug and conscious pain and suffering of Wright prior to his death, and on her own behalf for damages resulting from the death. The mate of the vessel, in a separate action, seeks recovery for personal injuries both from the estate of Wright and from the owner of the m/v Urubamba. The cross-libel of the owner of the m/v Urubamba against the estate asserts a contingent claim, in the event both vessels are found at fault for recovery over against the estate, in accordance with the divided damages rule, for any amount it might pay in satisfaction of any judgment which might be entered against it in these actions.

The m/v Urubamba is a dry cargo and bulk ore carrier of 3,893 tons, measuring 338 feet in length and 50 feet 3 inches in the beam with a depth of 29 feet. The tug Coot was a wooden-hulled canal type vessel measuring 50 feet 6 inches in length and 12 feet 2 inches in the beam with a depth of 5 feet 8 inches.

At the time of the collision the m/v Urubamba was being navigated by James P. MacIntire, a qualified, compulsory pilot, and the Coot was being navigated by its captain, who was also a licensed pilot.

The tug Coot on December 7, 1956, at approximately 8 P.M., sailed from the foot of Wall Street, New York City. At the time of sailing, and at the time of the collision, the tug Coot had in operation proper navigation and range lights.

The m/v Urubamba departed from Baltimore, Maryland, at 6:40 P.M. on December 8, 1956 in ballast. At the time of the collision, approximately 2:30 A.M. on December 9, 1956, the tug Coot was

Satterlee, Browne, Cherbonnier & Dickerson, New York City, for libelant Rebecca H. Wright. Edward R. Downing, John A. Cleason, New York City, of counsel.

Nelson, Healy, Baillie & Burke, New York City, for respondent and cross-libelant, Cion Corp. Peruna Desvaspores. Allan A. Baillie, Thomas L. Rohrer, New York City, of counsel.

O'Connor & Randolph, New York City, for libelant Howard A. Hughes. Anthony J. Randolph, New York City, of counsel.

CASHIN, District Judge.

These consolidated actions arise out of a collision between the motor vessel Urubamba, owned by respondent Cion Corp. Peruna Desvaspores, and the tug Coot, owned by the deceased John J. Wright. The collision occurred in the

navigating inbound on the Liston Range on the Delaware River. The Urubamba also had in operation proper navigation and range lights.

At the time of the collision the m/v Urubamba had already navigated through the Chesapeake and Delaware canals and was outbound on the Liston Range on the Delaware River.

At all relevant times prior to the collision the Urubamba had on watch on the bridge of the vessel, apart from the pilot, a watch officer, a helmsman and a lookout. During the same period the libelant Hughes was intermittently in the pilot house of the tug Coot.

The speed of the Urubamba prior to the collision was approximately ten knots over the ground, and that of the Coot was approximately seven knots.

At all relevant times the weather and tide conditions were such that they could not reasonably be expected to interfere with the proper navigation of the vessels. Both vessels sighted one another when they were four to five miles apart, and the vessels were in clear view of one another up until the time of the collision.

 To this point, the positions of the parties and the testimony of the witnesses are not in substantial variance. From this point on, however, the theories of the parties and the testimony of the witnesses vary greatly. Libelants, Wright and Hughes contend, and the witness Hughes testified, that the Urubamba was, in violation of the Inland Rules of Navigation (33 U.S.C. § 203), proceeding on the port rather than on the starboard side of the channel. However, it is clear that there was sufficient room, on whichever side the Urubamba was navigating, for either vessel to move far enough to either its port or its starboard to avoid the collision. Thus, even if the Urubamba was navigating on the wrong side of the channel, this violation of the Rules could not have been a proximate cause of the collision.

 The Urubamba's version of the collision is that there was ample room for a starboard-to-starboard crossing, but that when the vessels were approximately 200 feet apart the Coot suddenly veered to starboard at a time when no action upon the part of the Urubamba could possibly avert the collision. All of the Urubamba's witnesses testified that immediately upon the veering the Urubamba sounded an alarm signal and reversed its engines, but without avail.

The libelants' contention is that a head-to-head meeting was indicated and, that since the Urubamba was on the port side of the channel, it was incumbent upon her to move to starboard so as to bring the conventional port-to-port passing. The testimony is undisputed that prior to the sounding of the alarm signal by the Urubamba no signals whatsoever had been given by either vessel.

On the testimony adduced before me, and on the exhibits, I am constrained to accept, in the main, the version of the Urubamba. Not only did the testimony of its live witness, the pilot MacIntire, appear more credible, but the innate probabilities of the situation tend to the conclusion I have reached. Captain Wright, while undoubtedly a qualified pilot, was nevertheless a relatively aged man for the stringent work in which he was engaged, and had been working almost continuously for a long period of time. It is only natural, therefore, that his reflexes at the time of the collision would be somewhat dulled. On the other hand, the physical condition of the pilot MacIntire, at least as equally skilled a navigator, would seem to have been excellent. In addition, an experienced mate was also on watch on the Urubamba at the same time. The testimony by deposition of the mate corroborates the testimony of MacIntire, and any possible dereliction of MacIntire would almost undoubtedly have been corrected by the mate. Libelant Hughes testified, consistent with the version that a head-to-head passing was indicated, that the Urubamba struck the Coot merely a glancing blow with a portion of the hull of the Urubamba relatively far back from the stem. It is unlikely, however, that such a glancing blow would have caused the

immediate capsizing and sinking of the Coot. Rather, the result of the collision would seem to support the version of respondent Cion that the Coot was more or less perpendicular to the Urubamba at the time of the collision.

That I accept the version of the Urubamba for the most part does not mean that I exonerate her from fault. The testimony of the mate indicates that prior to the sudden veering of the Coot the action of the Coot "bothered him some". Despite this apprehension no passing signal was given by the Urubamba at all. The failure to give such a passing signal cannot at all be adequately explained by the pilot's observation that small vessels generally ignore passing signals. I cannot conceive that anyone, confronted with a situation which would make him apprehensive of an impending collision, would fail to take warning steps which were merely customary. Here, the warning steps indicated, namely the sounding of passing signals, were compulsory, therefore, a stronger case of negligence is made out. In order to find fault on the part of the Urubamba I do not deem it necessary to invoke the rule of The Pennsylvania, (1874, 19 Wall 125, 86 U.S. 125, 22 L.Ed. 148) to the effect that the violation of a statutory duty imposes upon the violator the duty of showing that the violation could not have contributed in any way to the disaster. Rather, I find that the failure to give the warning signal throws the Urubamba into fault by a positive showing of negligence.

Libelants Hughes and Wright contend strongly that the Urubamba was at fault in not maintaining a bow lookout. There is, of course, no statutory duty to have any particular type of lookout and, under the circumstances here involved, the failure to have a bow lookout, if it could at all be deemed negligent, did not in any way contribute to the happening of the accident. The Urubamba had the Coot in view long prior to the time the collision became imminent and the position of the Coot was at all times known to the personnel of the Urubamba.

In view of the rule of this country as to divided damages (Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318) the degree of fault of the vessels need not be ascertained in determining the claim of the libelant Wright for the loss of the Coot. Suffice it to say that the owners of the vessels must divide their damages in accordance with the Halcyon case, supra.

The divided damages rule, however, is not applicable to either the claim of the estate for conscious pain and suffering, to the death action on behalf of the widow, or to the claim of Hughes for personal injuries. These claims are to be decided under the rule of comparative negligence generally applicable to admiralty. In the case of the death action, the comparative negligence rule applies in this Circuit even though the libelant must look to a state Wrongful Death Act for her substantive cause of action and the applicable Wrongful Death Act would consider contributory negligence as a complete defense. Halecki v. United New York and New Jersey Sandy Hook Pilots Association, 2 Cir., 1958, 251 F.2d 708, vacated and remanded on other grounds United New York and New Jersey Sandy Hook Pilots Association v. Halecki, Administratrix, 358 U.S. 613, 79 S.Ct. 517. Insofar as the claims of Wright are concerned, I find that the decedent was guilty of fault to a degree of 70% of the total fault involved. This conclusion is based upon the fact that the decedent was navigating the tug at a time he knew, or should have known, that due to his long period of duty, with little rest, his efficiency would not be up to par, and to the further fact that his sudden turn to starboard, at a time when it was too late for the Urubamba to take remedial measures, was highly negligent.

I do not consider libelant Hughes guilty of any fault contributing to the accident. Captain Wright was concededly a more experienced and a more qualified navigator than Hughes. Captain Wright was in charge of the vessel and

was the employer of Hughes. Under these circumstances I believe that Hughes was entitled to rely upon the judgment of the captain as to the proper navigation of the Coot. Even though Hughes was admittedly apprehensive of danger being possible because of the relative courses of the vessels I find that he was justified in refraining from any attempt to instruct his superior on the proper navigation of the vessel which the superior was not only in charge of but also owned.

In the claim for wrongful death, libelant Wright has cited the New Jersey Wrongful Death Act as the applicable statute. However, it is impossible to determine as a fact from the record whether the death occurred in New Jersey or in Delaware, and, thus, whether the New Jersey Statute (N.J.S.A. 2A:-31–1 through 31–6) or the Delaware Statute (10 Del.C. § 3704(b) should apply. Under the peculiar circumstances of this case, namely, that of the class of persons who could recover under either Statute only a widow survives and the measure of damages in her behalf under both statutes is the same (New Jersey Statute—Hickman v. Taylor, D.C.Pa. 1948, 75 F.Supp. 528, affirmed, 3 Cir., 170 F.2d 327, certiorari denied 336 U.S. 906, 69 S.Ct. 485, 93 L.Ed. 1071, rehearing denied 336 U.S. 921, 69 S.Ct. 636, 93 L.Ed. 1083; Delaware Statute—O'Toole v. United States, 3 Cir., 1957, 242 F.2d 308), it is unnecessary to decide which statute applies since the recovery would be measured by the same rule of damages in either event.

■ Before reaching the question of damages one question of liability remains to be decided, that is, whether any credible evidence has been introduced that Captain Wright survived the collision so as to support the claim for conscious pain and suffering. I find that no such evidence has been presented. The libelant Hughes testified that subsequent to the collision he neither saw nor heard Captain Wright. The personnel aboard the Urubamba all testified that none had sighted Captain Wright at any time subsequent to the collision even though, as soon as possible, they scanned the waters surrounding the place of the collision with the aid of a searchlight. Therefore, I find that Captain Wright died immediately as the result of the collision.

■ In this connection it should be noted that both libelants seek to establish negligence on the part of the Urubamba because she did not immediately lower a lifeboat. Attempts were made soon after the collision to lower the port lifeboat. However, due to a mechanical defect the boat could not be lowered. No attempts were made to lower the starboard lifeboat. The negligence contended for is twofold:—

1st. In not conducting proper lifeboat drills and tests of the lifeboats; and

2nd. In failing to lower the starboard lifeboat after attempts to lower the port lifeboat failed.

Neither of these claimed acts of negligence can, however, aid either libelant. Captain Wright, as pointed out above, was never sighted at all. Thus, even had a lifeboat been immediately lowered it could not possibly have saved him. Libelant Hughes was picked up by a lifeboat from a passing vessel, the African Enterprise, soon after his sighting. Thus, the failure of the Urubamba to lower a lifeboat could not in any way have aggravated Wright's injuries.

■ There remains only to determine the quantum of damages recoverable on the claims outstanding. These claims are—

1. The claim of the estate of Wright for property damage;

2. The claim of the widow in the death action; and

3. The claim of Hughes for personal injuries, loss of personal effects, wages and maintenance and cure.

The measure of damages for a vessel totally lost in a collision is the "market value", where ascertainable, and pending freight, Ozanic v. United States, 2 Cir., 1948, 165 F.2d 738. In this case there was no expert testimony given as to the

"market value" of the Coot, except for the testimony of her seller whose interest in sustaining the reasonableness of the price charged, namely $10,000, is obvious. Weighted against the amount of the sale price is the fact that the seller had bought the tug within one month prior to the sale for $5,500. While the seller did testify that overhaul work was done on the tug, no estimate was made of the value of that work. On the skimpy evidence before me I find that the value of the vessel at the time of its loss was $7,500. In addition, Captain Wright purchased various accoutrements for the tug prior to sailing. The seller of the tug testified both to the fact of the purchase of these items and to their reasonable value. I find no reason to dispute the testimony of the seller and, therefore, hold that the value of the accoutrements, in the amount of $1,362.49, is also recoverable. The gross pending freight of the Coot is definitely shown to be $1,000 since the vessel at that time was under contract to deliver a carfloat from Baltimore to New York for that price. However, absolutely no evidence was introduced to indicate what portion of this gross freight would be profit. For instance, there is no evidence as to what wages would have to be paid to the crew for the voyage nor what price would have been expended for fuel. Under these conditions it is impossible to determine that any profit at all would be made, so that no recovery can be had for pending freight. The amount recoverable by the estate for property damage due to the collision is, therefore, $8,862.-49.

The measure of damages in the death action in behalf of the widow, under either the Jersey or Delaware Death statutes, is the contributions the deceased would have made to the widow during their joint lives, as commuted. The work expectancy of the decedent, who was 64 years old at the time of his death, was approximately seven years according to the Table of Working Life of the United States Department of Labor. Since his widow's life expectancy was longer than his, the full work expectancy is to be compensated for. The decedent's income for the three years preceding his death was shown to be approximately $3,500 a year. His widow testified that approximately 75% of this income was contributed to her. Respondent could not, of course, directly contradict this testimony. However, a certain amount of doubt has been cast upon its accuracy by the surrounding circumstances. The widow herself is employed and earns approximately $4,-700 a year. It is obvious, therefore, that some explanation had to be made why the spouse, who made considerably less money, would contribute a major part of his income to the spouse with the greater earning capacity. The professed explanation was the the widow had made substantial contributions, in turn, to her two married daughters and, to a much lesser extent, to her married son. The yearly income of the husband of each of the married daughters was approximately $10,000. No documentation of the widow's contributions to her children was presented, nor was any corroborative evidence of such contributions offered. Under all these circumstances I find that the contributions of the decedent to his widow were approximately $1,500 per year. Libelant Wright argues that, because of the new venture of Captain Wright, his yearly income would have been substantially increased. Any increase, however, which might result is far too speculative to warrant a finding thereof. Accordingly, I determine that libelant Wright is entitled to recover the amount of $1,500 per year for seven years, or $10,500, as commuted.

The gross damages recoverable by libelant Hughes are, as against the estate of Wright, earned wages, unearned wages, and maintenance and cure, and as against both respondents, damages for personal injuries, loss of earnings and loss of personal property.

Libelant Hughes testified that prior to the collision he had worked 26½ hours at straight wages, and 8 hours at overtime wages at time and a half. His basic

hourly wage was $2.65 per hour. Thus, his earned wages, at straight time, amount to $69.43, and for overtime $31.-80, making a total of $101.23. It appears that the voyage for which Hughes was hired would take eleven more days. I find that Hughes would have worked twelve hours a day for the remainder of the voyage and thus is entitled to a decree for said unearned wages.

 The medical testimony as to the injuries sustained by Hughes is somewhat conflicting. Dr. Balensweig, called on behalf of respondent Cion Corp., examined Hughes on December 19, 1957. Except for evidence of a healed fracture of the left tenth rib and a facial tic Dr. Balensweig found no evidence of injuries except for subjective complaints. He did testify, however, that an x-ray taken at the Public Health Service Hospital at Staten Island on December 18, 1956 had a suggestion of a fracture of the left first lumbar transverse process. Dr. Tandet examined Hughes on February 16, 1957. Apart from contusions and myositis, obviously transitory in nature, he found a fracture of the left 10th and 12th ribs, as well as a fracture of the left transverse process. In addition, x-rays taken by Dr. Tandet indicated a narrowing of the body of the 5th lumbar vertebra posteriorly, and a subluxation of the body of the 5th lumbar vertebra with impingement of the left transverse process upon the sacrum. Based upon the expert testimony, as well as the appearance of the libelant Hughes in Court, I find that, with the exception of the facial tic, none of the injuries suffered are permanent. I do find, however, that the facial tic was caused by a traumatic neurosis resulting from the collision. However, the tic in no way affects the earning capacity of Hughes and, because of his age and sex, is relatively unimportant cosmetically. As a result of the collision Hughes was immersed from over three-quarters of an hour to one and one-quarter hours in the water at a temperature of approximately 45 degrees, while the air temperature was approximately 50 degrees. It is, of course, impossible to determine with any semblance of mathematical accuracy the amount to be awarded for pain and suffering. I determine, however, that for pain and suffering, which includes the result of the injury itself, the exposure and the permanent facial tic, libelant Hughes is entitled to a decree in the amount of $5,000.

In determining the amount to be awarded for loss of earnings I am, once again, faced with a paucity of evidence. Hughes had not worked as a seaman for years prior to his shipping aboard the Coot. His testimony as to the employment which he did have for the years prior to this shipping is useless in estimating his prospective wages. The only evidence of Hughes' earning power, upon which any judgment can be based, is the salary he received in his employment next subsequent to the accident, which was at the rate of $106 per week. I find that Hughes was disabled from working when not compensated, by payment of unearned wages to be decreed herein, from December 17, 1956 until June 1, 1957, and that he is entitled to a decree for that period at the rate of $106 per week, less $106 actually earned.

Hughes is entitled to a decree for personal effects which he had aboard the Coot and which were lost. Without reviewing the details of the items allegedly lost and their value, I find their fair and reasonable value to be $250.

 Hughes has also requested a decree for maintenance and cure. I realize, of course, that in the ordinary seaman's case my finding that Hughes was disabled from working until June 1, 1957 would, at least *prima facie*, entitle him to a recovery for maintenance during that period except for the time actually confined in the hospital. There would be some question whether, in any event, an award for loss of earnings and an award for maintenance for the same period would constitute double recovery. (See Reardon v. California Tanker Company, 2 Cir., 1958, 260 F.2d 369). It is clear in this case, however, that an award of maintenance would give such a double

recovery to Hughes. As pointed out previously, Hughes had not worked as a seaman for a long period prior to the collision. The record is barren of any evidence that he intended to follow the calling of the sea subsequent to the one voyage for which he was hired by Captain Wright. Since it has not been shown that Hughes would, in the ordinary course of events, be working aboard a ship during his period of incapacity where he would be given his room and board in addition to his wages, I determine that no recovery for maintenance should be allowed. Hughes did, however, testify as to medical expenses not compensated for. These expenses consisted of $100 for repair of a dental plate, $30 for the extraction of three teeth, and $100 for the fee of Dr. Tandet. These expenses are recoverable without diminution from the estate of Wright as "cure".

The foregoing shall constitute my Findings of Fact and Conclusions of Law. Admiralty Rule 46½, 28 U.S.C.A.

 Respondent Cion has requested that the amounts paid by either the estate of Wright or Cion in satisfaction of any judgment obtained herein in favor of third parties be considered as part of the damages resulting from the collision and divided between the estate and Cion in accordance with the divided damages rule. This request is entirely proper and, accordingly, the decree to be entered herein shall contain such a provision. Cion further requests, however, that the amount to be decreed in favor of the widow in the death action be available to Cion for reimbursement in the event it pays more than its proportionate share to third parties under the divided damages rule, or that the amount to be decreed in favor of the widow in the death action be reduced by such an amount. This request is improper and is denied. It is true that the widow, as executrix, in one action has sued both on behalf of the estate for property damage to the Coot and on behalf of herself for damages due to the death of her husband. These actions are, however, independent. Any recovery for the property damage is on behalf of the estate and thus liable to any setoff which Cion might have against the estate. Any recovery on the death claim, however, is generally held to be in trust for the beneficiaries and not to be a part of the estate. 25 C.J.S. Death § 33. This general rule is followed by both New Jersey (Capraro v. Propati, 127 N.J.Eq. 419, 13 A.2d 318, reversing 126 N.J.Eq. 67, 8 A.2d 52; Lange v. Semanske, 108 N.J.Eq. 538, 155 A. 783), and Delaware (Jones v. Pennsylvania Railroad Company, 11 Terry 57, 50 Del. 57, 123 A.2d 111). Thus, the amount decreed in favor of the widow in the death action will be recovered by her, not as a representative of the estate, but as a trustee for the statutory beneficiaries. That the statutory beneficiary in this instance happens, incidentally, to be the executrix, does not change the rule.

Settle decree.