Joseph A. GUIDRY

v.

LeBEOUF BROS. TOWING CO., INC.

BAREBOAT CHARTER CO., INC.

v.

M/V ENTERPRISE, in rem, et al.

Civ. A. Nos. 72–1220, 72–3129.

United States District Court,
E. D. Louisiana.

July 29, 1975.

Samuel C. Gainsburgh, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, La., for plaintiff, Joseph A. Guidry.

William A. Porteous, III, Porteous, Toledano, Hainkel & Johnson, New Orleans, La., for defendant, LeBeouf Bros. Towing Co., Inc., in personam, and the M/V ENTERPRISE, in rem.

Robert A. Pitre, Jr., Gretna, La., for Bareboat Charter Co., Inc., in personam, and the M/V BUCCANNEER, in rem.

JACK M. GORDON, District Judge.

On January 12, 1972, a collision between the M/V ENTERPRISE and its tow and the M/V BUCCANNEER and its tow, occurred on the Intracoastal Waterway. At that time, the M/V ENTERPRISE was being operated by LeBeouf Bros. Towing Co., Inc. (hereinafter referred to as LeBeouf). The M/V BUCCANNEER was owned and operated by Bareboat Charter Co., Inc. (hereinafter referred to as Bareboat). Joseph A. Guidry, who was a crew member of the M/V BUCCANNEER, initiated Civil Action 72–1220 against LeBeouf to recover damages for personal injuries he allegedly sustained because of the collision. The basis of the plaintiff's claim against LeBeouf was negligence under the General Maritime Law. Thereafter LeBeouf, under Federal Rules of Civil Procedure 14(a) and (c), third-partied Bareboat, *in personam*, and the M/V BUCCANNEER, *in rem*. Bareboat then cross-claimed against LeBeouf, *in personam*, and the M/V ENTERPRISE, *in rem*. In the third party complaint and in the cross-claim, LeBeouf and Bareboat both seek recovery over against the other party if it is found liable on the plaintiff Guidry's original claim. In a separate suit, Civil Action 72–3129, Bareboat sought recovery against LeBeouf, *in personam*, and the M/V ENTERPRISE, *in rem*, for property damages sustained in the collision, by the M/V BUCCANNEER. The separate suits were consolidated. The plaintiff then amended his complaint to assert against Bareboat a claim based on negligence under the Jones Act and unseaworthiness under the General Maritime Law.

Trial by the Court on the issue of liability in the consolidated cases took place on January 29 and 30, 1975. After the trial, the Court requested additional briefs on certain issues. Subsequently, the case of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) was rendered. The Court then gave the parties the opportunity to reopen the case for further evidence, or to file additional briefs on the effect of the *Reliable* case on this litigation. The parties felt that the presentation of the additional evidence was not necessary. Bareboat submitted to the Court a letter which restated their position. LeBeouf submitted a letter which cited several cases dealing with apportionment of damages.

Therefore, after considering the testimony elicited at trial, the exhibits admitted into evidence, the pre-trial memorandum and the proposed findings of fact and conclusions of law, the post-trial briefs and the letters, the Court renders the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

The M/V BUCCANNEER's voyage had begun in Gretna, Louisiana, either during the very late night hours of January 7, 1972, or the very early morning hours of January 8, 1972. From there the tug and its empty tow had traveled west to Jefferson Island, Louisiana, loaded a cargo of salt and was returning eastward. The M/V ENTERPRISE and its tow had left Alvin, Texas, bound for Berwick, Louisiana. On January 12, 1972, the M/V ENTERPRISE and the M/V BUCCANNEER were proceeding east, with the M/V BUCCANNEER in the lead, on the Intracoastal Waterway between a point where, on the west, the Wax Lake Outlet intersects the waterway and where, on the east, the waterway meets the lower Atchafalaya River. On Nautical Chart 879–SC, which was admitted in evidence, the pertinent portion of the waterway is from Mile 105 on the west to Mile 98 on the east. That portion of the waterway generally lies in an east-west direction. At about Mile 98, the Intracoastal Waterway meets the Lower Atchafalaya River. The current in the river is much stronger than the normal current of the waterway. Both flotillas intended to turn north (left) into the Lower Atchafalaya River and head upriver. From Mile 101 to the intersection of the waterway and the river at Mile 98, the current of the river affected the current in the waterway, though to a greater extent closer to the river. The collision occurred approximately at Mile 99.

### 2.

The M/V ENTERPRISE, which was being operated by LeBeouf at the time of the collision, was a push tug which was approximately fifty-two feet in length, eighteen feet wide and had a seven foot draft. The M/V ENTERPRISE was powered by two engines which generated a total of 1,000 horsepower, and had twin screws which were independently controlled by separate throttles in the wheelhouse. Therefore, one engine and one screw could be turning at full ahead while the other screw and engine could be turning at full astern. The vessel had twin rudders which were controlled by a single stick in the wheelhouse. The wheelhouse was approximately eleven feet above the main deck. Seats, which were about thirty inches high, were available in the wheelhouse for the individuals who were steering and operating the tug. The M/V ENTERPRISE was equipped with a horn, a VHF radio and an AM single-sideband radio, which had Channel 2738. Mechanically, the AM single-sideband radio and Channel 2738 were operable but atmospheric conditions and the inherent characteristics of that frequency sometimes made short range communications on Channel 2738 difficult.

The M/V ENTERPRISE was pushing a tow which was comprised of three empty barges. The barges each were about 195 feet long, forty feet wide, eight feet deep and at the time were drawing one foot of water. The three barges were positioned in a line and, therefore, the total length of the tow was about 600 feet.

### 3.

The M/V BUCCANNEER, which was owned and operated by Bareboat, was a push tug, which was about forty-two feet long and fifteen feet wide. The M/V BUCCANNEER was powered by one 300 horsepower, six-cylinder engine and had a single screw. The tug

was wheelhouse-controlled and was equipped with an AM single-sideband radio, which had Channel 2738. The M/V BUCCANNEER's wheelhouse had an air horn which was powered by an air compressor. Though the evidence conflicts, the Court concludes that the air horn was inoperable at the time of the collision. Mr. Raymond Billiot, who was the captain of the M/V BUC-CANNEER, testified that the air horn was operable and that at several times in the past he had repaired the air compressor, which operated the horn, by replacing a fan belt. Mr. Joseph A. Guidry, who was the relief captain and who was navigating the M/V BUCCAN-NEER at the time of the collision, stated that the horn was not working at the time of the collision. A delivery ticket, LeBeouf No. 12, indicates that a fan belt was ordered from Gator Supply Co., Inc., in Harvey, Louisiana, on January 8, 1972, by an employee of Bareboat. According to the log of the M/V BUCCANNEER, LeBeouf No. 5, on January 8, 1972, the M/V BUCCAN-NEER was at LaRose and Bayou Beouf, Louisiana, and was westbound on the first leg of its voyage. Sometime later Mr. Billiot picked up the fan belt from Gator Supply Co., Inc. and signed the delivery ticket. The fan belt could not be used on any other equipment or machinery on the M/V BUCCANNEER, other than the air horn's air compressor. From the evidence adduced, the Court determines that the horn was inoperable on January 12, 1972.

The M/V BUCCANNEER was pushing, in line, two barges, which were each 125 feet long, thirty-five feet wide and six feet deep. Each barge carried a cargo of 8,500 one hundred-pound bags of salt and had about one foot of freeboard.

### 4.

When the M/V BUCCANNEER passed Mile 101, it was running at full ahead and was making about one and one-half to two miles per hour over land.

The speed of the M/V BUCCAN-NEER decreased as the flotilla approached the Lower Atchafalaya River and encountered the current of the river.

When the M/V ENTERPRISE rounded the bend at Miles 100 and 101, it was running at full ahead and was making about nine miles per hour over land. Upon rounding the bend the M/V ENTERPRISE first sighted the M/V BUCCANNEER about one mile ahead. At that time both vessels were heading east and were moving along near the right-hand bank of the waterway. Though there was a substantial blind spot in the view from the wheelhouse of the M/V BUCCANNEER because of the length of the tow and height above water of the bow of the empty lead barge, the personnel of the M/V ENTERPRISE sighted the M/V BUCCANNEER at the first possible point and thereafter constantly were able to view the M/V BUC-CANNEER.

### 5.

After sighting the M/V BUCCAN-NEER, the M/V ENTERPRISE began to reduce speed. The M/V BUC-CANNEER remained on a course near to and proximately parallel to the right bank; the M/V ENTERPRISE never attempted to move out into the middle of the channel and pass the M/V BUCCANNEER. Mr. Horace P. Brunet, who was the captain of the M/V ENTERPRISE and at the wheel of that vessel at the time of the collision, testified that he sounded a passing signal, received no response and then began to move to the port in order to pass the M/V BUCCANNEER. Mr. Buddy Wayne Turner, who was the mate of the M/V ENTERPRISE and who was present in the wheelhouse and observed the situation during the time preceding the collision stated that no passing maneuver was attempted and that he did not recall the sounding of a passing signal by Mr. Brunet of the M/V ENTERPRISE. Mr. Guidry testified that

he heard no passing signal. Mr. Turner, Mr. Brunet, and Mr. Guidry testified that during the time before the collision, several westbound vessels had been encountered along the waterway. Mr. Turner testified that the westbound tow had cleared by a short distance when the collision occurred. Mr. Guidry testified that the last westbound tug and tow was 200 to 250 feet past the M/V BUCCANNEER when the collision took place. Mr. Brunet testified that he was one-quarter of a mile behind the M/V BUCCANNEER when the last westbound tow passed him. The presence of a westbound tow in the immediate area would have hindered, if not made impossible, an attempt by the M/V ENTERPRISE to pass the M/V BUCCANNEER. From the testimony elicited, the Court is of the opinion that a westbound tow was in the immediate proximity and that decision supports the conclusion that the M/V ENTERPRISE did not attempt a passing maneuver. Mr. Brunet was considering a passing maneuver since he wished to be proceeding into the current of the Lower Atchafalaya River at full speed. The westbound tows, however, interferred with his intentions.

Though the M/V ENTERPRISE was reducing speed, the M/V ENTERPRISE continued to gain on the M/V BUCCANNEER. At about Mile 99 when the M/V ENTERPRISE reached a point approximately within 100 feet of the M/V BUCCANNEER, the M/V ENTERPRISE was moving at about two miles per hour over land. Shortly thereafter, the M/V ENTERPRISE changed to full astern with both engines. The reversing of the engines was not quite successful and the front barge of the M/V ENTERPRISE's tow ran up on the rear of the M/V BUCCANNEER. The port bow section of the lead barge hit the stern starboard quarter of the M/V BUCCANNEER. The collision resulted in the M/V BUCCANNEER being pushed up on the back of its rearmost barge. The impact was not un-

usually violent. Neither Mr. Guidry nor Mr. Billiot were injured by the impact itself. The M/V BUCCANNEER did not sink and Bareboat seeks damages in the amount of $10,617.31 for property damage to the tug, loss of use and detention. The pictures, LeBeouf No. 6 and Guidry No. 4A–Q, do not show extensive damage to the tug.

At the time of the collision, the M/V ENTERPRISE was proceeding roughly parallel and near to the right bank. Shortly before the collision, the stern of the M/V BUCCANNEER swung toward the left-hand bank of the waterway because the wheel had been left unattended. If this swing had not occurred, the front barge or the M/V ENTERPRISE's flotilla would have collided with the full stern of the M/V BUCCANNEER, and not with only the starboard stern quarter.

### 6.

Communication to the M/V BUCCANNEER by way of VHF radio unsuccessfully was attempted by Mr. Brunet, while Mr. Guidry tried to raise the M/V ENTERPRISE on the AM single-sideband radio on Channel 2738 and was unsuccessful.

### 7.

Mr. Guidry first sighted the M/V ENTERPRISE when it was about 1,000 feet behind him. After that sighting, Mr. Guidry unsuccessfully attempted to call the M/V ENTERPRISE on his radio and continued to operate the controls of the M/V BUCCANNEER. Later, Mr. Guidry went out on the deck behind the wheelhouse, observed the M/V ENTERPRISE and waived his arms in an attempt to gain the attention of the M/V ENTERPRISE. After waving, Mr. Guidry returned to the wheelhouse and again attempted to call the M/V ENTERPRISE by radio. If his horn had been operable, Mr. Guidry at this point would have employed the air horn and sounded a danger signal. When he looked to the rear for the last

time, Mr. Guidry observed the M/V ENTERPRISE to be sixty-five to seventy feet behind his vessel. LeBeouf's attempt to impeach Mr. Guidry by his previous deposition testimony in which he at one point stated that the last time he looked the M/V ENTERPRISE was 300 to 400 feet behind him is unsuccessful. A complete reading of his deposition testimony reveals that his deposition and trial testimony are consistent. Mr. Guidry was alarmed by the proximity and course of the M/V ENTERPRISE. Fearing an imminent collision, Mr. Guidry abandoned the controls, ran around to the deck in front of the wheelhouse by way of the deck which surrounded the wheelhouse and attempted to climb over the rail and down to the second deck. Instead, when climbing over the rail, Mr. Guidry slipped and fell six to seven feet to the second deck. Mr. Guidry did not use the ladder which led to the second deck and which was located at the rear of the wheelhouse deck.

Mr. Guidry's abandonment of the controls allowed the wheel to turn as it pleased but the engine control lever remained at full ahead. The unattended wheel accounts for the swing, which occurred before the collision, of the stern of the M/V BUCCANNEER.

Mr. Guidry fell and found himself on the second deck before the collision occurred. Mr. Guidry testified at trial that the fall occurred about fifteen seconds before the collision, while at his deposition he stated that a couple of minutes elapsed between the time of his fall and the collision.

8.

Mr. Harry W. Reineke was qualified by LeBeouf and accepted by the Court as an expert in the field of naval architecture and marine engineering. In response to a hypothetical question which took into account the situation in the waterway and the characteristics of the M/V ENTERPRISE and its tow, Mr. Reineke testified that the M/V ENTERPRISE and its tow if making two

miles an hour over ground (which is derived from speed in water minus adverse current) it would take 102 feet and 34½ seconds to come to zero miles per hour over land. This calculation included the time to shift the machinery and maintain a response from the engines (30 seconds) and the time to decelerate (4½ seconds). The calculation was made without any consideration for water resistance which would have shortened the stopping distance. At two miles per hour over land, the M/V ENTERPRISE was making about 2.9 feet per second.

CONCLUSIONS OF LAW

Before beginning a discussion on the parties' assertions of liability, the Court will dispose of several preliminary points.

■ The Court has jurisdiction of this case by virtue of the admirality and maritime subject matter of the claims involved. U.S.Const. Art. 3, § 2; 28 U.S.C. § 1333. In this case involving both property damage and personal injury claims, the Court will apply the principles and precedents of the admiralty law of collision. *See generally, Halcyon Lines v. Haenn Ship Ceiling and Refitting Co.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204 (5th Cir. 1968) *cert. denied,* 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968); *Wright v. Cion Corp. Peruna Desvaspores,* 171 F.Supp. 735 (S.D.N.Y.1959); *see also, Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir. 1975) and the Navigation Rules for Harbors, Rivers and Inland Waters, generally (hereinafter referred to as Inland Articles), 33 U.S.C. § 151, *et seq.*

The Court will begin the discussion on the issue of liability with a general summary of the positions of the parties. The defendant Bareboat contends that the actions of the M/V BUCCANNEER were faultless and that the M/V ENTERPRISE's conduct caused the collision. The defendant LeBeouf

admits that the M/V ENTERPRISE is not totally free from fault, but avers that the M/V BUCCANNEER also contributed to the collision. The plaintiff, Mr. Guidry, argues that his injuries were caused by the conduct of LeBeouf, Bareboat, or both, and that he was not contributorily negligent. In the event that they are found liable, LeBeouf and Bareboat argue that the plaintiff was contributorily negligent.

First, the Court will consider the actions of the M/V ENTERPRISE. Bareboat specifically contends that the M/V ENTERPRISE violated Inland Article 23,[1] which imposes on a vessel, which is approaching another vessel, a duty to slacken speed, Inland Article 24,[2] which requires overtaking vessels to keep out of the way of overtaken vessels,

Inland Article 29,[3] for failure to maintain a proper lookout, and Inland Article 18 Rule VIII,[4] for failure to give passing signals. Apart from the statutory violations, Bareboat presents numerous allegations which basically assert that, under the circumstances, the M/V ENTERPRISE was being navigated negligently.

■ The Court concludes that whether the actions of the M/V ENTERPRISE are viewed as violations of Inland Articles 23 and 24, or as negligence for failure to exercise, under the circumstances, due care and good seamanship, *Miller v. Semet-Solvay Division, Allied Chemical Corporation*, 406 F.2d 1037 (4th Cir. 1969) *cert. denied* 395 U.S. 921, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969), the M/V ENTERPRISE is

1. Inland Article 23 reads as follows:
   "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." 33 U.S.C. § 208.

2. Inland Article 24 reads as follows:
   "Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.
   Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.
   As by day the overtaking vessel cannot always know with certainty whether she is forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way." 33 U.S.C. § 209.

3. Inland Article 29 reads as follows:
   "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or

of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. § 221.

4. Inland Article 18 Rule VIII reads in pertinent part:
   "When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.
   The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." 33 U.S.C. § 203.

liable. The M/V ENTERPRISE's conduct was wrongful and that conduct was a cause of the collision.

Though liable on those grounds, the M/V ENTERPRISE did not violate Inland Articles 18, Rule VIII or 29. First, the Court's finding that no passing maneuver was attempted by the M/V ENTERPRISE renders inapplicable Inland Article 18, Rule VIII's requirement for sounding passing signals. Second, assuming that Inland Article 29 required a lookout to be stationed on the bow of the M/V ENTERPRISE's lead barge, the Court concludes that the lack of a bow lookout did not contribute to the collision. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). Mr. Brunet, who, at the time of the collision, was the captain of and at the controls of the M/V ENTERPRISE, observed the M/V BUCCANNEER as he rounded a bend in the waterway. At that point he was about one mile behind the M/V BUCCANNEER. From the time of the first sighting, Mr. Brunet was able constantly to observe visually the M/V BUCCANNEER. The collision was not caused by a failure to be aware of the M/V BUCCANNEER. Though the Pennsylvania Rule places a heavy burden on a statutory violator to show that his statutory fault could not have caused or contributed to the collision, it does not require that the violator must prove that "its fault could not, by any stretch of the imagination, have had a casual relation to the collision, no matter how speculative, improbable or remote." *China Union Lines v. A. O. Anderson Co.*, 364 F.2d 769, 782 (5th Cir. 1966) *cert. denied*, 386 U.S. 933, 87 S.Ct. 955, 17 L. Ed.2d 805 (1967). The Court concludes that even if a lookout on the lead barge was required, that a failure to do so could not have contributed to the collision since the captain of the M/V ENTERPRISE at the first opportunity sighted and thereafter observed the M/V BUCCANNEER. *United States v. The Soya Atlantic*, 330 F.2d 732 (4th Cir. 1964), *Harbor Towing Corporation v. Isthmian Lines, Inc.*, 310 F.Supp. 775 (D.Md.1970) *aff'd.* 438 F.2d 535 (4th Cir. 1971); *Daniels v. Trawler Sea-Rambler*, 294 F.Supp. 228 (E.D.Va. 1968); *Oil Transfer Corp. v. Atlantic Tankers, Ltd.*, 194 F.Supp. 920 (S.D.N. Y.1960) *aff'd.* 297 F.2d 367 (2nd Cir. 1962).

Next, the Court will examine the conduct of the M/V BUCCANNEER. The Court has found that the air horn on the M/V BUCCANNEER was inoperable on the day of the collision. Inland Article 15 reads in pertinent part:

"... A steam vessel shall be provided with an efficient whistle or siren, sounded by steam or by some substitute for steam, so placed that the sound may not be intercepted by any obstruction ..." 33 U.S.C. § 191.

Furthermore, "the overtaken vessel is under an obligation to sound a signal when danger is apparent. *The Howard*, 256 F. 987 (4th Cir. 1919)." *Clary Towing Co., Inc. v. Port Arthur Towing Co.*, 367 F.Supp. 6 (E.D.Tex.1973). The M/V BUCCANNEER violated Inland Article 15; the Pennsylvania Rule is applicable. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). Bareboat has not carried the burden of the Pennsylvania Rule and shown that the statutory violation could not have contributed to the collision. Upon first sighting the M/V ENTERPRISE when it was about 1,000 feet behind him, Mr. Guidry attempted to communicate by radio with the M/V ENTERPRISE. When Mr. Guidry observed the M/V ENTERPRISE for the second time at a distance of approximately 600 to 700 feet, he attempted to attract the attention of the M/V ENTERPRISE by waving his arms at the approaching vessel. After waving at the M/V ENTERPRISE, Mr. Guidry again tried to radio the M/V ENTERPRISE. Mr. Guidry would have employed his air horn, if it had been working, to sound a

danger signal. The sounding of a danger signal when the M/V ENTERPRISE was 600 to 700 feet behind the M/V BUCCANNEER would have provided the M/V ENTERPRISE with ample time in which to reverse engines and come to zero miles per hour over land; about 100 feet was all that was needed. By operating a vessel which did not have a horn, Bareboat, violated Inland Article 15 and contributed to the collision.

■ Before discussing the issue of apportionment of damages between the M/V ENTERPRISE and the M/V BUCCANNEER, the Court must consider the conduct of Mr. Guidry. Both Bareboat and LeBeouf contend that Mr. Guidry was contributorily negligent. One ground for a finding of contributory negligence was Mr. Guidry's failure to sound, by horn, a danger signal. Since the Court has found that the air horn was inoperable, this contention fails.

■ Second, Bareboat and LeBeouf argue that Mr. Guidry had sufficient time to walk to the rear of the wheelhouse deck, climb down the ladder to the second deck and then move to the front of the vessel. They argue that, consequently, he acted unreasonably when he abandoned the wheelhouse, hurried to the front of the wheelhouse deck, attempted to climb over a rail and down to the second deck, and in his haste slipped and fell to the second deck. The Court concludes that Mr. Guidry acted reasonably under the circumstances. At all times after Mr. Guidry first had sighted the M/V ENTERPRISE, it had been closing steadily on the M/V BUCCANNEER. Mr. Guidry tried both the available conventional and unconventional means of communicating with the M/V ENTERPRISE. The M/V ENTERPRISE did not reverse its engines until it was within 100 feet of the M/V BUCCANNEER. Since the M/V ENTERPRISE was making about 2.9 feet per second, and it took about thirty seconds to shift the gears from forward to reverse, the M/V ENTERPRISE would have traveled a considerable dis-

tance before a change in speed was noticeable. It must be noted that Mr. Guidry observed the M/V ENTERPRISE for the last time when it was about sixty-five to seventy feet behind him. When Mr. Guidry last observed the M/V ENTERPRISE, it was still making considerable progress through the water toward the stern of the M/V BUCCANNEER. If the M/V ENTERPRISE had continued at two miles per hour over land, it would have covered the last one hundred feet in about thirty-three seconds and the last sixty-five to seventy feet in approximately twenty-three seconds. The time between Mr. Guidry's last observation and the collision was lengthened by the changing of the M/V ENTERPRISE's engines from full ahead to full reverse. Mr. Guidry cannot be faulted for not foreseeing the change of the engine setting of the M/V ENTERPRISE. Finally, it must be noted that the collision did occur as Mr. Guidry expected. Mr. Guidry did not act unreasonably when he chose to avoid the probable area of impact and in great haste, take an alternate route.

■ Thus having found the M/V ENTERPRISE and the M/V BUCCANNEER at fault and that the fault of each was a cause of the collision, the Court must follow the mandate of the *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) and apportion damages between the vessels which have been found to be at fault. The rule of comparative negligence would have applied to Mr. Guidry's claim and he would not have participated in the division of damages, had the Court found him contributorily negligent. *See, Empire Seafoods, Inc. v. Anderson*, 398 F. 2d 204 (5th Cir. 1968) *cert. denied*, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968); *Wright v. Cion Corp. Peruna Desvaspores*, 171 F.Supp. 735 (S.D.N.Y. 1959). The damages to be apportioned include the claims for damages suffered by the M/V BUCCANNEER and the personal injuries sustained by Mr. Guid-

ry. In *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Supreme Court stated:

> "Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoers shall share equally the damages sustained by each as well as personal injury and property damage inflicted on innocent third parties." 342 U.S. at 284, 72 S.Ct. at 279."

*Accord, Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir. 1968) *cert. denied* 393 U.S. 983, 89 S.Ct. 449, 21 L. Ed.2d 444 (1968). *See also, Weyerhaeuser Steamship Co. v. United States*, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963).

Having determined what damages are to be apportioned, all that remains undecided is the percentage of liability between the M/V ENTERPRISE and the M/V BUCCANNEER. The Court concludes that the M/V ENTERPRISE and LeBeouf should be assigned sixty-five (65%) percent of the liability and the M/V BUCCANNEER and Bareboat thirty-five (35%) percent. The M/V ENTERPRISE created the dangerous situation by following too closely the M/V BUCCANNEER, with the hope of passing the slower vessel before entering the stronger current of the Lower Atchafalaya River. If the M/V BUCCANNEER had had an operable air horn, a danger signal would have been sounded which would have alerted the M/V ENTERPRISE to the dangerous situation. Though in respect to the M/V BUCCANNEER, what should have happened is the basis for the assignment of liability, the policy and operation of the Pennsylvania Rule requires strict adherence to the statutory rules. The M/V BUCCANNEER was not operating in conformity with the rules and that nonconformance contributed to the collision; the M/V BUCCANNEER must assume a portion of the liability for the collision.

Accordingly, based on the above Findings of Fact and Conclusions of Law,

It is ordered that preparations proceed for trial on the issues of quantum, and, thereafter, judgment issue in accordance with these Findings of Fact and Conclusions of Law on the issue of liability.